UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES GREGORY CALLION,

Plaintiff,

v.

ANTIS ADAMS, et al.,

Defendants.

Case No.  14-cv-03716-HSG

**ORDER GRANTING PENDING SUMMARY JUDGMENT MOTIONS; GRANTING LEAVE TO FILE AMENDED COMPLAINT**

Re: Dkt. Nos. 26, 29

**INTRODUCTION**

Plaintiff, a California prisoner currently incarcerated at R.J. Donovan Correctional Facility, filed this *pro se* civil rights action under 42 U.S.C. § 1983.  Plaintiff was previously incarcerated at Salinas Valley State Prison ("SVSP"), and alleges that during that time, Dr. Barron Palmer,[1] and SVSP doctors Birdsong, Mack, Bright, Dunlap, and Adams (collectively, "CDCR Defendants") were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment.  Now before the Court are summary judgment motions filed by Dr. Palmer (Docket No. 26) and by the CDCR Defendants (Docket No. 29).  Plaintiff has filed an opposition to the summary judgment motions, Docket No. 34, and an objection to Dr. Macho's declaration, Docket No. 35.  Dr. Palmer and the CDCR Defendants have both filed replies.  Docket Nos. 36 and 37.  For the reasons set forth below the Court GRANTS the summary judgment motions filed by the CDCR Defendants and by Dr. Palmer, and GRANTS Plaintiff leave to file an amended complaint.

---

[1] Dr. Palmer is a surgeon employed by the County of Monterey, which contracts with the California Department of Corrections and Rehabilitation ("CDCR") for the provision of medical care to inmates at Natividad Medical Center.  Docket No. 26-2 at 5.

United States District Court
Northern District of California

United States District Court
Northern District of California

# BACKGROUND

The following facts are undisputed unless otherwise noted.

In 2005, prior to being incarcerated, Plaintiff was involved in a serious car accident which fractured his pelvis in six places. Docket No. 34-1 at 1. A titanium plate and four screws were surgically implanted to stabilize his pelvis. Docket No. 34-1 at 1 and Docket No. 28-20 at 5. Plaintiff also had a severe post-operative infection that required additional surgery and took two years to heal. Docket No. 28-20 at 5.

## A.      Medical Treatment of Abscess during 2012[2]

Plaintiff was transferred from Kern Valley State Prison to SVSP sometime in early April 2012. On April 17, 2012, Plaintiff submitted a health care service request regarding a small lump between his buttocks that had appeared in March 2012, and which had since increased in size and made it extremely painful for him to sit. Docket No. 34-3 at 7. On April 19, 2012, Plaintiff was examined by named defendant Dr. Birdsong, who immediately sent him to the prison infirmary for an emergency appointment. Docket No. 34-3 at 7. The attending physician at the prison infirmary prescribed Plaintiff hemorrhoid suppositories and clindamycin, an antibiotic. Docket No. 34-3 at 15.[3] On May 2, 2012, Dr. Birdsong discontinued the hemorrhoid medication and prescribed an additional antibiotic, trimethoprim-sulfamethoxazole. Docket Nos. 34-1 at 3 and 34-4 at 5. Plaintiff finished the prescribed course of antibiotics and saw no improvement in his condition. Docket No. 34-3 at 8.

On May 20, 2012, Plaintiff submitted a health care service request, stating that the lump between his buttocks had not decreased and continued to be extremely painful. Plaintiff requested to be examined by a doctor. Docket No. 34-3 at 8. On May 22, 2012, Plaintiff was examined by a

---

[2] Plaintiff's health records indicate that he also suffers from migraines and high blood pressure, and has been diagnosed with anemia (iron deficiency), primary parathyroidism, plantar fasciitis, and latent tuberculosis. Docket No. 28-11 at 37. However, because Plaintiff only challenges the diagnosis and treatment of his methicillin-resistant staphylococcus aureus ("MRSA") infection, *see* Docket No. 34 at 8, the Court does not address the medical treatment Plaintiff received for his other health issues.

[3] Plaintiff alleges that he was misdiagnosed as having hemorrhoids, *see* Docket No. 34-1 at 3, but there is no hemorrhoid diagnosis reflected in his medical records, Docket No. 34-3 at 7, and Defendants state that the attending physician suspected that Plaintiff had an abscess, Docket No. 26-2 at 7.

United States District Court
Northern District of California

1  nurse.  Docket No. 34-3 at 8.  On May 28, 2012, Plaintiff submitted another health care service

2  request, stating that the lump had grown to the size of a golf ball, that the lump had become very

3  hot and was burning his skin, and that the related abscess was draining but he had nothing to clean

4  it.  Docket No. 34-3 at 9.  On May 30, 2012, Plaintiff was sent to the prison infirmary, where the

5  lump was surgically lanced and drained by Dr. Tuvera, who is not a named defendant.  Docket No.

6  34-3 at 15.  Dr. Tuvera noted that the bulk of the lump was hard fleshy material, and he sent a

7  sample for biopsy and culture.  Docket No. 34-3 at 15.  Dr. Tuvera prescribed Plaintiff a 10-day

8  course of trimethoprim-sulfamethoxazole.  Docket No. 34-3 at 15.  On June 4, 2012, Dr. Sullivan,

9  who is not a named defendant, conducted a follow-up examination, and noted that Plaintiff

10  reported no pain and no new issues.  Docket No. 34-3 at 16.

11      The test results of Plaintiff's biopsy were received by Dr. Tuvera between June 6 and June

12  11, 2012 and showed a "light growth" of methicillin-resistant staphylococcus aureus ("MRSA").

13  Docket Nos. 28-21 at 4 and Docket No. 28-24 (California Correctional Health Care System Care

14  Guidelines for Skin and Soft-Tissue Infections, *hereinafter* "CCHCS Care for SSTIs") at 4–7.

15  MRSA is caused by antibiotic-resistant bacteria and is most commonly found in skin infections.

16  CCHCS Care for SSTIs at 4–7.  The lab testing indicated that Plaintiff's MRSA was specifically

17  resistant to clindamycin, doxycycline, and trimethoprim-sulfamethoxazole, the three antibiotics

18  that the CDCR recommends to treat MRSA, Docket Nos. 28-1 ("Bright Decl.") ¶ 6 and 28-24 at 4,

19  but sensitive to vancomycin and linezolid, Docket No. 28-21 at 10.  The CDCR restricts

20  prescription of vancomycin and linezolid to serious infections, noting that these particular

21  antibiotics have serious side effects.  CCHCS Care for SSTIs at 2.  CDCR guidelines also state

22  that linezolid should only be prescribed in consultation with an infectious disease specialist.

23  CCHCS Care for SSTIs at 2.

24      Between June 2012 and October 2012, Plaintiff submitted two health care service requests

25  seeking supplies to dress his abscess.  Docket No. 28-3 at 22–23.  The medical clinic refused to

26  change Plaintiff's dressings so Plaintiff was forced to handle the dressing changes himself.

27  Plaintiff was not provided with the necessary dressing supplies and at times was forced to use

28  toilet paper to pack his abscess.  Docket No. 34-1 at 4–5.

United States District Court
Northern District of California

1    On November 18, 2012, Plaintiff submitted a health care service request, requesting an

2    examination by a nurse, not a doctor, to determine why his abscess had not yet healed.  Docket

3    No. 34-3 at 12.   He stated that the abscess had persisted for over five months and was now

4    bleeding.  Docket No. 34-3 at 12.

5    On November 27, 2012, Plaintiff was examined by Dr. Birdsong, who diagnosed Plaintiff

6    with a fistula and put in an urgent request for Plaintiff to have general surgery.  Docket No. 28-15

7    at 2.  Dr. Birdsong prescribed Keflex, an antibiotic used to treat bacterial infections.  Docket No.

8    28-15 at 2.  Dr. Birdsong also collected a tissue sample from the abscess which he sent out for

9    testing.  Docket No. 28-21 at 10.  The lab report was dated December 4, 2012, and indicated that

10   the tissue sample had a "light growth" of MRSA.  Docket No. 28-21 at 10.  Dr. Birdsong reviewed

11   this lab report on December 6, 2012.  Docket No. 28-21 at 10.

12   On November 28, 2012, Dr. Birdsong submitted an urgent request for Plaintiff to have

13   general surgery at Natividad Medical Center to treat his fistula.  Docket No. 28-15 at 2–3.  On

14   December 18, 2012, Plaintiff was examined by Dr. Palmer of Natividad Medical Center.  Docket

15   Nos. 26-4 at 3 and 26-5 at 26–28.  Dr. Palmer obtained a medical history from Plaintiff and

16   performed a physical examination.  Docket Nos. 26-4 at 3 and 26-5 at 26–28.  Dr. Palmer formed

17   the impression that Plaintiff had an anal fistula.  Docket Nos. 26-4 at 3 and 26-5 at 26–28.  An

18   anal fistula is a chronic abnormal communication, like a tunnel, that forms between the anus and

19   the skin surface.  An anal fistula generally starts from an infected gland in the anus, and results in

20   an abscess that drains spontaneously through the "tunnel" from the infected gland to the skin.

21   Docket No. 26-4 at 3.  Dr. Palmer recommended a fistulotomy and a colonoscopy.  Docket Nos.

22   26-4 at 3 and 26-5 at 26–28.  A fistulotomy involves surgically removing the infected tissue and

23   surgically opening the fistulous tract, to allow the tissue and tract to heal.  Docket No. 26-4 at 3

24   and Docket No. 26-14 at 5.  Dr. Birdsong submitted a request for the recommended fistulotomy,

25   which prison officials approved on December 20, 2012.  Docket No. 28-15 at 5.

26   **B.    January 10, 2013 Fistulotomy**

27   On January 10, 2013, Dr. Palmer attempted to carry out the fistulotomy.  Docket Nos. 26-4

28   at 4 and 26-5 at 24.  However, Dr. Palmer was unable to identify the internal opening of the fistula

4

tract despite using a Hill-Ferguson retractor in the anal canal to allow for better exposure and injecting hydrogen peroxide.  Docket No. 26-5 at 24.  Dr. Palmer instead enlarged the external opening of the tract, removed a large fibrous tract, and cleared out granulation tissue.  Docket No. 26-5 at 24.

**C.      Medical Care from January 2013 through May 2013**

Plaintiff alleges that Dr. Palmer refused to prescribe him antibiotics after the procedure, and that Dr. Palmer stated that the body would naturally fight off infections.  Docket No. 34-1 at 4.  Dr. Palmer does not address this allegation, and Dr. Palmer's patient notes do not include recommendations for post-op care specific to Plaintiff.  Plaintiff was given a handout titled "Discharge Instructions for Anal Abscess and Anal Fistula," which explained anal abscesses and anal fistulas, listed home care suggestions, discussed medication and prevention, and identified symptoms that warranted an immediate call to the doctor.  Docket No. 34-4 at 71–72.  Under prevention, the handout stated: "An anal abscess is often caused by a condition like Crohn's Disease or ulcerative colitis.  By treating the underlying disease, anal abscess can be prevented."  Docket No. 34-4 at 72.

Plaintiff had difficulty obtaining dressing supplies and, two days after his fistulotomy, had to use toilet paper to dress his open wound because he had no dressing supplies.  Docket No. 34-1 at 5.

From January 2013 through March 2013, Dr. Palmer saw Plaintiff approximately every two weeks for follow-up appointments.[4]  Dr. Palmer observed that the wound was healing, but that there continued to be mild drainage.  Docket Nos. 26-5 at 21–22 and 26-4 at 4.  At the March 12, 2013 follow-up appointment, Dr. Palmer noted in his patient notes that further incision and drainage might be necessary since the abscess had not yet completely healed.  Docket No. 26-5 at 19.

During this same time period, prison doctors and nurses regularly monitored Plaintiff's abscess by seeing him for follow-up examinations and handling dressing changes, sometimes on a

United States District Court
Northern District of California

---

[4] The follow-up examinations took place on January 22, February 12, February 22, March 12, and March 26, all in 2013.  Docket Nos. 26-4 at 4–5 and 26-5 at 16–22.

daily basis. *See* Docket Nos. 28-3 at 37–50 and 28-4 at 1–26. On February 9, 2013, Plaintiff was examined by a prison nurse, who recorded in the examination notes that Plaintiff reported suffering from fever, chills and sweats for the past few days. Docket No. 28-3 at 41. The nurse attributed these symptoms to Plaintiff's fistula. Docket No. 28-3 at 41. However, the nurse also noted that his fistula "look[ed] ok." Docket No. 28-3 at 41. On February 11, 2013, Dr. Birdsong again prescribed Plaintiff trimethoprim-sulfamethoxazole. Docket No. 34-1 at 5. During mid-February, Plaintiff again complained of chills and fever. Docket No. 28-3 at 44–45. At the end of March 2013, Plaintiff told his nurses that he was "fine" and "not having any fever or pain." Docket No. 28-4 at 7–11, 17, 20 and 21.

On March 26, 2013, Plaintiff had a follow-up appointment with Dr. Palmer. Dr. Palmer observed that while the external opening of the abscess had closed, there was active serious drainage from the remaining opening and the fistula tract extended about 6 cm deep. Docket Nos. 36-5 at 17 and 26-4 at 5. Dr. Palmer recommended that Plaintiff be examined further under anesthesia and indicated that a second fistulotomy might be necessary. Docket Nos. 36-5 at 17 and 26-4 at 5. The next day, Dr. Birdsong put in the request for Plaintiff to receive the second fistulotomy. Docket No. 28-15 at 13. The request was rejected on April 4, 2013, for failure to fill out the proper paperwork. Docket Nos. 28-15 at 15 and 29 at 10. Soon thereafter, Dr. Mack replaced Dr. Birdsong as Plaintiff's primary care physician. Docket No. 1 at 9. Dr. Mack resubmitted the examination/fistulotomy request on April 19, 2013. Docket No. 28-15 at 16. Dr. Mack also prescribed Plaintiff amoxicillin, a different antibiotic. Docket No. 34-1 at 6 and Docket No. 28-4 at 39.

On May 14, 2013, during a routine dressing change, the nurse noticed excessive greenish drainage. Docket No. 28-5 at 11. She referred Plaintiff to Dr. Kumar. Docket No. 28-5 at 11. Dr. Kumar prescribed Plaintiff a seven-day course of clindamycin/ciprofloxacin, an antibiotic. Docket No. 28-5 at 11.

On May 21, 2013, Plaintiff had a follow-up examination with Dr. Mack. Docket No. 28-3 at 36. Dr. Mack noted that, per the nurse's examination, Plaintiff's abscess was healing but there was still drainage. Docket No. 28-3 at 36. The drainage was less green in color. Docket No. 28-3

at 36.  Dr. Mack noted that the examination/fistulotomy request had not been approved.  Dr. Mack

made two follow-up calls to the scheduler and scheduled the examination for May 30, 2013.

Docket No. 28-3 at 36.  In the progress note for this examination, Dr. Mack also noted that

Plaintiff had multi-drug resistant MRSA.  Docket No. 28-3 at 36.  In his complaint, Plaintiff states

that Dr. Mack informed him that he had MRSA at this appointment.  Docket No. 1 at 10.

**D.      May 30, 2013 Partial Fistulotomy**

On May 30, 2013, Dr. Palmer examined Plaintiff under anesthesia.  Dr. Palmer was again

unable to locate an internal opening of the fistulous tract within the anus.  Docket Nos. 26-4 at 5

and 26-5 at 14.  Dr. Palmer's examination indicated that the fistulous tract extended beyond 10

cm.  Docket No. 26-4 at 5.  Dr. Palmer performed a partial fistulotomy, laying open the last six

inches of the fistula tract.  Docket No. 26-4 at 5.  He also cleared out a significant amount of

granulation tissue and cauterized a fibrous capsule in the cavity.  Docket No. 26-5 at 14.  Plaintiff

alleges that this surgery was a "total failure," arguing that an incomplete surgery could not heal his

anal fistula.  Docket No. 34-1 at 6.

**E.      Follow-up Care from June through October 2013**

Over the next five months (June 2013 through September 2013), Dr. Palmer saw Plaintiff

for seven follow-up appointments,[5] and prison doctors and nurses saw Plaintiff over 120 times for

regular follow-up examinations and dressing changes, Docket Nos. 28-5 at 27–43, 28-6, 28-7, and

28-8 at 1–33.  Plaintiff describes Dr. Palmer's follow-up treatment as "useless."  Docket No. 34-1

at 6.

During the June examinations and dressing changes by prison medical staff, the nurses

noted no infection in the wound.  Docket Nos. 28-5 at 38, 40, and 28-6 at 2.  In mid-June, Plaintiff

reported feeling a significant amount of pain.  Docket No. 28-6 at 4-5 and 7.  On June 28, 2013,

prison doctors prescribed two different antibiotics for Plaintiff, metronidazole and ciprofloxacin.[6]

---

[5] The follow-up examinations took place on June 7, June 21, July 12, August 2, August 27, October 8, and October 22, all in 2013.  Docket Nos. 26-4 at 6–7 and 26-5 at 5–12.

[6] Plaintiff alleges that he was prescribed ciprofloxacin/metronidazole on June 20, 2013, Docket No. 34-1 at 6, but his health records indicate that he was prescribed these antibiotics on June 28, 2013, *see* Docket No. 28-6 at 13.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Docket No. 28-6 at 13.  Dr. Palmer's two June examinations of Plaintiff indicated moderate

2   drainage, but that the wound was clean and healing well.  Docket No. 26-4 at 6.  Plaintiff disputes

3   Dr. Palmer's assessment of his wound, and states that his fistula was clearly not healing since it

4   continued to produce excessive drainage.  Docket No. 34-1 at 6.

5       On July 12, 2013, Plaintiff was seen by Dr. Palmer, who concluded that healing was taking

6   place because there was minimal drainage and some granulation tissue was present.  Docket No.

7   26-4 at 6.  Plaintiff again disputes Dr. Palmer's assessment that his wound was healing, stating

8   that the continued discharge from the fistula indicated that the fistulotomy was a failure and that

9   the wound was not healing at all.  Docket No. 34-1 at 5.

10      On July 24, 2013, Dr. Ali prescribed Plaintiff trimethoprim-sulfamethoxazole, but does not

11  specify why this antibiotic was prescribed.  Docket No. 28-6 at 48.

12      On August 2, 2013, at Plaintiff's fourth follow-up appointment with Dr. Palmer after his

13  May 2013 partial fistulotomy, Plaintiff reported continued and severe pain and green drainage

14  from his wound.  Docket Nos. 26-4 at 6 and 26-5 at 9.  Dr. Palmer's examination indicated that the

15  fistula site was visible and dry with no visible drainage, and that the depth of the tract had

16  decreased.  Docket Nos. 26-4 at 6 and 26-5 at 9.  There was no visible sign of infection.  Docket

17  No. 26-5 at 9.

18      On August 6, 2013, Plaintiff was seen by Dr. Mack with regard to a prison grievance.

19  Docket No. 28-7 at 14.  Dr. Mack noted that the fistulotomy performed by Dr. Palmer initially

20  helped but that Plaintiff was "now tolerant."  Docket No. 28-7 at 14.  Dr. Mack proposed

21  reculturing the wound.  Docket No. 28-7 at 14.  Based on his examination of Plaintiff, Dr. Mack

22  found that Plaintiff was not a high-risk patient and therefore did not qualify for transfer to

23  California Health Care Facility – Stockton.  Docket No. 28-7 at 14.  He agreed to consider housing

24  Plaintiff in SVSP's Correctional Treatment Center, an inpatient health care facility, depending on

25  housing availability.  Docket No. 28-7 at 14.   In his opposition to the summary judgment motion,

26  Plaintiff alleges that he was first informed that he had MRSA on this date.  Docket No. 34-1 at 7.

27      On August 9, 2013, Dr. Mack had a culture of Plaintiff's fistula-related abscess sent out for

28  testing.  Docket No. 28-7 at 14.  Plaintiff was seen daily for dressing changes over the next week,

and the nurses' notes indicate that Plaintiff's fistula was healing.  Docket No. 28-7 at 14–21.

On August 16, 2013, Dr. Mack received the test results which indicated that Plaintiff's anal fistula had been infected with a strain of MRSA that was only responsive to vancomycin, linezolid, synercird, and valinomycin.  Docket No. 28-7 at 22.  Dr. Mack scheduled a follow-up with Dr. Palmer.  Docket No. 28-7 at 22.  Dr. Mack also submitted a request to treat Plaintiff's MRSA with a one-month course of zyvox (linezolid), stating that Plaintiff's MRSA was resistant to formulary drugs and noting that Plaintiff had already been prescribed bactrim (trimethoprim-sulfamethoxazole), clinda, keflex (cephalexin), and levaquin.  Docket No. 34-4 at 4.  This request was disapproved,[7] with the notation that Dr. Palmer's recent examination indicated that Plaintiff's wound was healing well and showed no sign of infection.  Docket No. 34-4 at 4.

On August 22, 2013, Plaintiff requested and obtained copies of his personal medical records.  Docket No. 34-1 at 7.

On August 27, 2013, Dr. Palmer again examined Plaintiff.  He noted that the fistula had recently developed increased drainage.

On October 8, 2013, at Plaintiff's sixth follow-up appointment with Dr. Palmer after his May 2013 partial fistulotomy, Dr. Palmer recommended further examination of the wound under anesthesia because the fistula tract had not fully healed five months after the second surgical procedures.  Docket Nos. 26-4 at 7 and 26-5 at 7.

At the next appointment, on October 22, 2013, Dr. Palmer noted that the drainage from the fistulous tract was increasing now, and that the tract now extended beyond 10 cm.  Docket No. 36-5 at 5.  Dr. Palmer diagnosed Plaintiff with a persistent complex anal fistula and recommended further efforts to locate the source of the fistula tract, specifically an MRI of the pelvis to determine whether there were undrained extensions or abscesses that required additional procedures.  Docket No. 26-5 at 6.  Dr. Bright denied Dr. Palmer's request for an MRI and recommended a fistulagram instead, but the MRI was ultimately approved.  Docket Nos. 28-8 at

---

[7] It is unclear who disapproved the request because the signature is illegible.  However, the request was directed towards the Chief Medical Officer, which could mean that it was routed to one of the two SVSP Chief Medical Executives, Dr. Dunlap or Dr. Adams, or that it was routed to the Chief Physician & Surgeon, Dr. Bright.

28 and 28-15 at 27, 29.

**E.      November 2013 MRI and Medical Care from November thru December 2013**

On November 7, 2013, an MRI was performed, but no abscess was visible and "no definite anal fistula [was] identified." Docket No. 28-8 at 38.  A CT scan of Plaintiff's pelvis was recommended.  Docket No. 28-8 at 38.

On November 26, 2013, Dr. Posson, a new doctor and not a named defendant, examined Plaintiff and found no overt sign of infection and recommended a follow-up with Dr. Palmer. Docket No. 28-8 at 40.  On December 13, 2013, Plaintiff was sent to see Dr. Palmer, but his appointment was rescheduled because the MRI films had not been sent along with him.  Docket No. 28-8 at 43.  On December 16, 2013, an urgent request for services was sent out on Plaintiff's behalf to procure him an appointment with Dr. Palmer.  Docket No. 28-8 at 46.  Plaintiff was also tentatively scheduled for a December 26, 2013 CT scan of his pelvis.  Docket No. 28-8 at 46.  On December 18, 2013, Dr. Posson examined Plaintiff and concluded that his abscess should be tested again for MRSA.  Docket No. 28-8 at 48.  Dr. Posson noted that if Plaintiff were still positive for MRSA, vancomycin should be considered to treat his MRSA.  Docket No. 28-8 at 48.

On December 23, 2013, Plaintiff's culture came back positive for a light growth of MRSA. Docket No. 28-8 at 51.  On January 2, 2014, Dr. Posson attempted to move up Plaintiff's appointment with Dr. Palmer in order to discuss MRSA treatment.  Docket No. 28-8 at 55.

**F.      Medical Care in 2014**

On January 21, 2014, Plaintiff had a telemedicine consult with Dr. Rupnik, an infectious disease specialist at Queen of the Valley Medical Center.  Docket No. 28-20 at 2–4.  Dr. Rupnik concluded as follows:

> The patient's course and workup to date are suspicious for a persistent focus of infection in his pelvic trauma, likely the plate or screws, with an MRSA fistula developing.  Also consider the possibility of an intracutaneous fistula, although I think this is less likely.  The patient has a highly resistant MRSA in cultures, and antibiotic therapy will need to be intravenous.  If the plate and screws are involved, then surgical removal will be the only way to cure this infection.

Docket No. 28-20 at 3–4.  Dr. Rupnik recommended a radiologic fistulogram to track the fistula to its source, a complete blood count test, a comprehensive metabolic panel, an erythrocyte sedimentation-rate test, and a follow-up consultation in February 2014.  Docket No. 28-20 at 4.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Dr. Posson reviewed Dr. Rupnik's report the next day, and planned to follow Dr. Rupnik's

2   recommendations.  Docket No. 28-9 at 2–3.  Dr. Posson also noted that Dr. Rupnik "purposefully

3   did not make any recommendations for antibiotics at that time, although he was aware of the

4   cultures."  Docket No. 28-9 at 2.  Dr. Posson concluded that it was premature to do additional

5   imaging for infection in the area of Plaintiff's plate and screws, but stated that such imaging would

6   be necessary at some point to rule out the plate and screws as a cause of the infection.  Docket No.

7   28-9 at 3.

8    On January 25, 2014, Plaintiff was admitted to the prison emergency room with complaints

9   of abdominal bleeding and protrusion near the site of an old scar from his pelvic surgery.  Docket

10   No. 28-9 at 5–7.  Plaintiff told prison officials that he believed the protrusion was related to his

11   MRSA.  Docket No. 28-9 at 7.  Plaintiff was sent to an outside hospital for examination, where a

12   CT scan was conducted of his pelvis and abdomen.  Docket No. 28-9 at 5.  The CT scan showed a

13   fistula in the suprapubic abdominal wall.  Docket No. 28-18 at 61–62.

14    On January 27, 2104, Dr. Posson examined Plaintiff and reviewed the CT scan.  Docket

15   No. 28-9 at 10–11.  He noted that there was a possibility that the new abdominal fistula was

16   communicating with the rectal fistula.  Docket No. 28-9 at 11.  He speculated that the abdominal

17   fistula was likely caused by the 2005 postoperative infection and surgical drains.  Docket No. 28-9

18   at 11.  He noted the MRSA in the anal fistula.  Docket No. 28-9 at 11.  Dr. Posson obtained a

19   culture from the wound, which he sent off to the lab.  Dr. Posson also submitted an urgent request

20   for a urology evaluation, possible cystoscopy, and follow-up with Dr. Rupnik, Docket No. 28-9 at

21   11, which Dr. Bright approved, Docket No. 28-16 at 8–9.  Dr. Posson also planned on calling Dr.

22   Palmer to see if a colonoscopy and referral to a gastrointestinal specialist was necessary.  Docket

23   No. 28-9 at 11.

24    On February 4, 2014, Dr. Posson again met with Plaintiff to follow-up on the January 27,

25   2014 examination.  Docket No. 28-9 at 15.  According to Dr. Posson's notes at this time, Plaintiff

26   had been prescribed trimethoprim-sulfamethoxazole [8] from Dr. Lawson at the outside hospital.

27

28   [8] The medical progress notes reflect a prescription for bactrim, which is the brand name for
    trimethoprim-sulfamethoxazole.

United States District Court
Northern District of California

1    Docket No. 28-9 at 15.  Dr. Posson also noted that both Plaintiff's abdominal fistula and his rectal

2    fistula were colonized with MRSA and that the MRSA was resistant to everything but vancomycin

3    and rifampin.  Docket No. 28-9 at 15.  Dr. Posson's notes indicated that Plaintiff's anal fistula was

4    not painful and was still draining, and that Plaintiff was not experiencing fevers, chills, nausea,

5    vomiting or diarrhea.  Docket No. 28-9 at 15.  Dr. Posson also planned to obtain a

6    hematology/oncology consult to evaluate Plaintiff for possible myeloma (blood cancer) in addition

7    to the consults with the gastrointestinal specialist and infectious disease specialist.  Docket No. 28-

8    9 at 16.  Dr. Posson concluded that "[n]o antibiotics are indicated at this time."  Docket No. 28-9

9    at 16.

10          On February 6, 2014, a fistulagram and an additional CT scan were conducted, both of

11   which indicated that the rectal fistula appeared to connect with the new abdominal fistula.  Docket

12   Nos. 28-18 at 75 and 28-19 at 2.

13          On February 14, 2014, Plaintiff was seen by Dr. Palmer.  Docket No. 26-4 at 8.  Dr.

14   Palmer was not provided with the actual MRI images, and was only provided with the written

15   report made by a radiologist who interpreted Plaintiff's November 2013 MRI.  Docket No. 26-4 at

16   8.  The radiologist reported that the MRI showed mild inflammatory changes surrounding the

17   rectum, but no free fluid or abscess.  Docket No. 26-4 at 8.  No definite anal fistula could be

18   identified.  Docket No. 26-4 at 8.  Plaintiff reported continued drainage from the wound and

19   continued discomfort.  Docket No. 26-5 at 2.  Dr. Palmer planned a debridement procedure

20   (removal of infected tissue) in hopes of allowing the area to heal.  Docket Nos. 26-4 at 8 and 26-5

21   at 4.  Plaintiff never returned to see Dr. Palmer, so the debridement procedure never took place.

22   Docket No. 26-4 at 8.  Plaintiff states that Dr. Palmer did not suggest a debridement procedure, but

23   rather suggested another fistulotomy.  Docket no. 34-1 at 10.

24          On February 18, 2014, Plaintiff had a telemedicine consult with Dr. Rupnik.  Docket No.

25   28-20 at 5–6.  Dr. Rupnik's notes from the consult state that Dr. Rupnik's impression was the

26   radiologic evidence "support[ed] the possibility of an MRSA plate infection and chronic

27

28

1    osteomyelitis."[9]  Docket No. 28-20 at 6.  In the consult notes, Dr. Rupnik recommended an

2    orthopedic evaluation for a second opinion regarding his diagnosis; requested a copy of the CT

3    scan; and recommended a follow-up appointment in April.  Docket No. 28-20 at 6.  Plaintiff

4    claims that Dr. Rupnik told him that MRSA had infected the titanium plate in his pelvis, and

5    recommended that Plaintiff see an orthopedic specialist to determine whether it would be

6    medically safe to remove the plate.  Docket No. 34-1 at 10.

7         On February 21, 2014, Plaintiff had a consultation with an oncologist who allegedly stated

8    that Plaintiff may have developed multiple myeloma.  Docket No. 28-9 at 26.  At examinations on

9    February 25 and 26, 2014, both doctors stated that they believed that Plaintiff's MRSA was likely

10   caused by an infection surrounding the pelvic plate that had persisted for several years, and then

11   recently fistulized out to the perirectal area and also the supraumbilical area.  Docket No. 28-9 at

12   28 and 30.  At the February 26, 2014 appointment, Dr. Posson noted that Plaintiff had MRSA

13   colonization of fistula tracts but that no antibiotics were indicated at that time.  Docket No. 28-9 at

14   30.

15        On March 5, 2014, Plaintiff was seen by an orthopedist, who wrote that Plaintiff had a

16   "very complicated case outside of [his] scope of practice."  Docket No. 28-16 at 26.  The

17   orthopedist concluded that Plaintiff urgently needed a referral to a tertiary center, where he could

18   be examined by infectious disease specialists and orthopedic trauma specialists.  Docket No. 28-16

19   at 26.  On March 7, 2014, Plaintiff was seen for an oncology consultation, and the oncologist

20   recommended various tests, including a bone marrow biopsy.  Docket No. 28-16 at 27.  Plaintiff

21   was approved for the bone marrow biopsy, which took place on March 26, 2014.  Docket Nos. 28-

22   16 at 28 and 28-19 at 11.  On March 28, 2014, Plaintiff was again seen by Dr. Posson, who

23   expressed concern that Plaintiff had been experiencing chills — a sign of an MRSA infection —

24   since March 25, 2014.  Docket No. 28-10 at 1–2.  On April 3, 2014, Plaintiff was admitted to the

25   prison ER after he developed rigors, sudden chills accompanied by a rise in temperature.  Docket

26   No. 28-19 at 24.  Plaintiff was then sent out to Twin Cities Hospital.  Docket No. 28-10 at 3–4.  At

27

28   _____

[9] Osteomyelitis is a bone infection.

13

the hospital intake, the nurses noted that Plaintiff did not have a temperature, did not have trouble breathing, and did not have abdominal pain.  Docket No. 28-19 at 23.  Plaintiff was given a CT scan of the abdomen and pelvis, and was started on vancomycin while blood cultures were pending.  Docket No. 28-19 at 24–25.

On April 16, 2014, after Plaintiff had returned to SVSP, Plaintiff was seen at Natividad Medical Center to review the bone marrow biopsy.  Docket No. 28-19 at 30.  Preliminary studies of the biopsy were not consistent with multiple myeloma, but a FISH study was positive for genetic abnormalities associated with cancer.  Docket No. 28-19 at 30.  The biopsy was sent to Stanford University for further review.  Docket No. 28-19 at 30.  It was recommended that Plaintiff see an endocrinologist for further evaluation.  Docket No. 28-19 at 31.  On June 17, 2014, Plaintiff had a telemedicine consultation with an endocrinologist.

On June 20, 2014, Plaintiff was seen by Dr. Tuvera to follow-up on May 2014 blood tests, which were positive for hypercalcemia.  Docket No. 28-10 at 6.  Dr. Tuvera noted that they were "still waiting for a tertiary hospital to do surgery for debridement and possible removal of the plates of [Plaintiff's] pelvis."  Docket No. 28-10 at 6.

On July 15, 2014, Plaintiff was again seen by Dr. Tuvera.  Dr. Tuvera noted that Plaintiff's pain was "slightly controlled" and that he was able to get in and out of his bunk, able to walk to meals, and able to shower, dress, groom, and use the toilet.  Docket No. 28-10 at 9.  Dr. Tuvera also noted that Plaintiff had "osteomyelitis pelvis with cutaneous–cutaneous communication abdominal wall to perineum."  Docket No. 28-10 at 9.  In other words, there was a bone infection in Plaintiff's pelvis that had spread from the skin of the abdominal wall to skin surrounding the perineum.  Dr. Tuvera noted that Plaintiff was waiting on a consult from a tertiary center, most likely UCSF.  Docket No. 28-10 at 9.

On July 31, 2014, Plaintiff was seen by Dr. Tuvera for a follow-up on his fistula.  Docket No. 28-10 at 12.  Plaintiff reported more pain in his pelvis and more discharge coming from the abdominal fistula.  Docket No. 28-10 at 12.  An MRI of Plaintiff's pelvis was ordered on an urgent basis.  Docket No. 28-10 at 12.  Dr. Tuvera noted that Plaintiff was awaiting an appointment for a telemedicine consultation with an orthopedist from a tertiary facility in Southern California which

14

1   would do a culture of the discharge.  Docket No. 28-10 at 12.

2          On August 6, 2014, Dr. Tuvera approved Plaintiff's transfer to Correctional Treatment

3   Center to address the copious and increased drainage from his fistulas.  Docket No. 28-10 at 14.

4   Plaintiff had no fever or chills at the time, and was not in distress.  Docket No. 28-10 at 14.

5          On August 15, 2014, Plaintiff filed the instant action.  Docket No. 1.

6          On August 19, 2014, the results from the culture of Plaintiff's drainage, ordered on July

7   31, 2014, were received by SVSP.  Docket No. 28-22 at 15.  The results indicated that Plaintiff

8   continued to have a light growth of MRSA that was sensitive to rifampin and vancomycin.

9   Docket No. 28-22 at 15.

10          On September 5, 2014, Plaintiff had a telemedicine consultation with an orthopedic

11   specialist who recommended debridement and surgical removal of his plate to address the bone

12   infection.  Docket No. 28-20 at 10.  On September 11, 2014, Dr. Tuvera cautioned Plaintiff that

13   delaying or refusing the surgery could cause sepsis or death.  Docket No. 28-10 at 22.  Plaintiff

14   refused to have the surgery done at that time and is presently still considering whether to have the

15   surgery.  Docket Nos. 28-10 at 22 and 34-1 at 11–12.

16   **G.      Plaintiff's Inmate Grievance Regarding His Medical Treatment**

17          On July 7, 2013, Plaintiff filed inmate grievance HC 13049470, challenging the

18   "misdiagnosis" of his abscess/fistula and the related medical treatment, and requesting to see a

19   specialist' to be transferred to Stockton where there is a new hospital facility for correct treatment;

20   to see a pain specialist to manage pain; and financial compensation.  Docket Nos. 28-23 at 2–14.

21   In this grievance, Plaintiff states:

22          . . . during a routine check of my medical records, it was discovered the biopsy results
            taken 11 mos earlier showed the antibiotics I was given were useless.  As the fistula
23          infection was resistant due to it being severely infected with bacteria.  Had anyone checked
            the results 11 mos before, they would have known this and a different more effective
24          treatment could have been ordered.

25   Docket No. 28-23 at 6.

26          The grievance was initially assigned to Dr. Adams at the first level of review, Docket No.

27   28-23 at 4, but ultimately handled by Dr. Mack and Dr. Bright, Docket No. 28-23 at 10–11.

28          On August 9, 2013, Dr. Mack interviewed Plaintiff regarding this grievance.  Docket No.

United States District Court
Northern District of California

15

28-23 at 10.  On August 26, 2013, Dr. Mack and Dr. Bright denied Plaintiff's grievance at the first level of review on the following grounds: Plaintiff was not at high risk, his pain would be managed by his primary care physician, and monetary compensation is not with the scope of a medical 602.  Docket No. 28-23 at 10–11.  Plaintiff appealed this denial to the second level of review on October 14, 2013, and also included new allegations of misdiagnosis, negligence, incompetence and inadequate medical care. On November 25, 2013, this grievance was denied by Dr. Dunlap at the second level of review on the same grounds as the first-level denial.  Docket No. 28-23 at 10–11.  In addition, Dr. Dunlap stated that Plaintiff should submit a separate grievance regarding the concerns that he raised for the first time in his appeal of the first-level denial. Docket No. 28-23 at 10.  On April 18, 2014, California Correctional Healthcare Services Deputy Director J. Lewis denied Plaintiff's grievance at the third and final level (also referred to as the Director's Level of Review).  Docket No. 28-23 at 2–3.  Director Lewis found that Plaintiff's health records indicated the following:

> [Plaintiff has] been routinely evaluated, treated, monitored, and educated by [his] PCP and by multiple specialists, including infectious disease, orthopedic, hematology/oncology, and general surgeon regarding [his] appeal issues and concerns.
>
> [Plaintiff's] pain is being monitored and on March 20, 2014, [Plaintiff's] PCP noted that [Plaintiff] would be watched closely for increasing pain.  Medication History on April 16, 2014 shows [Plaintiff has] an active order for morphine for pain.
>
> There is no documentation that a transfer to Stockton was medically indicated at the time of this review.

Docket No. 28-23 at 2.  Director Lewis repeated that monetary compensation is beyond the scope of the CDCR appeals process.  Docket No. 28-23 at 2.

## DISCUSSION

### A.     Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'"  *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**B.     Claims**

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they failed to treat his MRSA with effective antibiotics and when they failed to promptly inform him that he had been diagnosed with MRSA.  Docket No. 1 ("Compl.") at 3–15; Docket No. 34 at 9.  Defendants deny that they committed any constitutional violation, and also argue that they are entitled to qualified immunity.

**1.     Legal Standard**

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A "serious" medical need exists if the failure to treat a prisoner's condition could result in

1    further significant injury or the "unnecessary and wanton infliction of pain." *See McGuckin v.*

2    *Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc.*

3    *v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (citing *Estelle*, 429 U.S. at 104). A determination

4    of "deliberate indifference" involves an examination of two elements: the seriousness of the

5    prisoner's medical need and the nature of the defendant's response to that need. *See id.*

6        A prison official is deliberately indifferent if he knows that a prisoner faces a substantial

7    risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*

8    *v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from

9    which the inference could be drawn that a substantial risk of serious harm exists," but he "must

10   also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not,

11   then the official has not violated the Eighth Amendment, matter how severe the risk. *Gibson v.*

12   *Cty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). In order for deliberate indifference to be

13   established, therefore, there must be a purposeful act or failure to act on the part of the defendant

14   and resulting harm. *See McGuckin*, 974 F.2d at 1060

15       Deliberate indifference may be manifested in two ways: (1) a denial, delay or intentional

16   interference with medical treatment, or (2) the provision of medical care in an unconstitutional

17   manner by prison physicians. *McGuckin*, 974 F.2d at 1060. In either case, however, the

18   indifference to medical needs must be substantial. Inadequate treatment due to negligence,

19   inadvertence, medical malpractice or differences in judgment between an inmate and medical

20   personnel does not rise to the level of a constitutional violation. *Sanchez v. Vild*, 891 F.2d 240,

21   242 (9th Cir. 1989); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

22       Defendants do not dispute, and the Court agrees, that Plaintiff's MRSA constitutes a

23   serious medical need. *See, e.g.*, *Sansome v. Lopez*, No. CV 1-07-1086-FRZ, 2013 WL 3198594, at

24   *4 (E.D. Cal. June 21, 2013) (finding prisoner's claims of having developed "(staph) MRSA

25   infections" to be serious medical needs because "an infection, if not properly treated, could result

26   in further significant injury or the unnecessary and wanton infliction of pain.") (internal quotation

27   marks and citations omitted); *Amason v. Wedell*, No. 2:12-CV-0388 KJN P, 2014 WL 2987695, at

28   *3 (E.D. Cal. July 1, 2014) (assuming prisoner's "cellulitis, neuropathy, leg, foot, and ankle

United States District Court
Northern District of California

swelling and pain" were sufficiently serious medical needs under the Eighth Amendment).

The Court now turns to whether Defendants were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment.

### 2. Failure to Inform

Defendants do not dispute that Plaintiff was not informed that he had tested positive for MRSA until May 2013,[10] nearly a year after the lab tests first indicated that he had MRSA. Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they failed to promptly inform him of his MRSA.[11]   Docket No. 34-1 at 7.  Defendants argue that there is no case law holding that a failure to provide certain information to an inmate is an Eighth Amendment violation, and that there was no harm from the denial of such information.  Docket No. 36 at 6.  Because the Court agrees that no case law holds that that a failure to provide certain information to an inmate is an Eighth Amendment violation, the Court finds that Defendants are entitled to qualified immunity on this failure to inform claim.

### a. Qualified Immunity Legal Standard

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal

---

[10] Plaintiff provides two different dates for when he first learned he had MRSA.  According to Plaintiff's complaint, he learned he had MRSA on May 21, 2013.  Docket No. 1 at 10.  In his opposition, Plaintiff states that he learned he had MRSA on August 6, 2013.  Docket No. 34-1 at 7.  However, the record contradicts the date provided in Plaintiff's opposition.  In a grievance filed on July 7, 2013, Plaintiff was aware that he had MRSA, stating that a biopsy taken eleven months earlier indicated that his fistula infection was "severely infected with bacteria" and resistant to the antibiotics that he been prescribed.  Docket No. 28-23 at 6.  Accordingly, the Court presumes that the date provided in Plaintiff's complaint is the accurate date.

[11] Plaintiff claims that, pursuant to prison regulations, Drs. Birdsong and Mack had a responsibility to "inform and disclose to him of any abnormal diagnostic test results."  Docket No. 34 at 26.  Assuming arguendo that Drs. Birdsong and Mack violated prison regulations, this does not, by itself, state a constitutional violation.  There is no liability under § 1983 for violating prison policies.  *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009).

United States District Court
Northern District of California

quotation marks and citation omitted).  The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'"  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)).  "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties."  *Id.*

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident.  *Pearson*, 555 U.S. at 232.  Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.

With respect to the second prong of the qualified immunity analysis, the Supreme Court has recently held that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate."  *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation and internal quotation marks omitted).  This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Id.* (citation and internal quotation marks omitted).  In conducting this analysis, the Court must determine whether the pre-existing law provided defendants with "fair notice" that their conduct was unlawful.  *Id.* at 1777.

Courts should not define clearly established law at a high level of generality.  *See Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (noting that the Supreme Court has repeatedly chastised the Ninth Circuit for conducting the clearly established inquiry at too high a level of generality).  The "clearly established" inquiry is fact-specific and highly contextualized.  *Id.*  It is

United States District Court
Northern District of California

not necessary that "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Hamby*, 821 F.3d at 1095 ("a plaintiff need not find a case with identical facts in order to survive a defense of qualified immunity . . . but the farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional").  But qualified immunity is warranted unless existing precedent placed the constitutional question beyond debate.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

A court determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act."  *Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)).  In the absence of binding precedent, the court may look to all available decisional law, including the law of other circuits and district courts.  *See id.*; *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (only in absence of decisional authority by Supreme Court or Ninth Circuit are other sources of decisional law, such as out-of-circuit cases, considered).  Unpublished district court decisions may also "inform" the court's analysis.  *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004).  It will, however, "be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, [that the court] can conclude that the law was clearly established on the basis of unpublished decisions only."  *Sorrels v. McKee*, 290 F.3d 965, 971–72 (9th Cir. 2002).

**b.**     **Analysis**

Plaintiff has not cited any case that holds that the failure to inform an inmate of his test results constitutes an Eighth Amendment violation.  Nor is the Court aware of any such case.  The case cited by Plaintiff, *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 280, (1990), does not discuss the Eighth Amendment.  Rather, *Cruzan* discussed whether an incompetent person had the same liberty interest in refusing treatment as a competent person, and whether the Constitution forbids a state from applying a clear and convincing evidentiary standard to requests for withdrawal of treatment made by the guardians of an incompetent person.  *Cruzan*, 497 U.S. at 278–81.

United States District Court
Northern District of California

1   Because there is no binding precedent holding that the failure to inform an inmate of his

2   test results constitutes an Eighth Amendment violation, the Court cannot conclude that in not

3   promptly informing Plaintiff of his MRSA diagnosis, Defendants would have to understand that

4   they were violating a clearly established right, or that "existing precedent . . . placed the statutory

5   or constitutional question beyond debate." *Sheehan*, 135 S. Ct. at 1774; *see, e.g.*, *Taylor v.*

6   *Barkes*, 135 S. Ct. 2042, 2044 (2015) (finding no clearly established right to the proper

7   implementation of adequate suicide prevention protocols in correctional facilities where no

8   Supreme Court case had "even discusse[d] suicide screening or prevention protocols"). For this

9   reason, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's failure to

10   inform claim. The Court GRANTS summary judgment in favor of Defendants on Plaintiff's

11   failure to inform claim.

12   However, the Court finds that Plaintiff has stated a cognizable Fourteenth Amendment

13   claim against the CDCR Defendants. In his opposition, Plaintiff argues that had he learned of his

14   MRSA diagnosis in June 2012, he would have refused the fistulotomies. Docket No. 34 at 27.

15   The Ninth Circuit has held that the Fourteenth Amendment provides for the right to be "free from

16   unjustified intrusions into the body." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citing

17   *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). That right includes the right "to refuse unwanted

18   medical treatment and to receive sufficient information to exercise these rights intelligently." *Id.*

19   (citing *White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990)); *see also White*, 897 F.2d at 113 ("A

20   prisoner's right to refuse treatment is useless without knowledge of the proposed treatment.

21   Prisoners have a right to such information as is reasonably necessary to make an informed

22   decision to accept or reject proposed treatment, as well as a reasonable explanation of the viable

23   alternative treatments that can be made available in a prison setting."); *Pabon v. Wright*, 459 F.3d

24   241, 250 (2d Cir. 2006) ("[T]here exists a liberty interest in receiving such information as a

25   reasonable patient would require in order to make an informed decision as to whether to accept or

26   reject proposed medical treatment."). However, Plaintiff has not stated a cognizable Fourteenth

27   Amendment claim against Dr. Palmer. As discussed *infra* in Section B.4, the record reflects that

28   Dr. Palmer had no responsibility for treating Plaintiff's MRSA and no knowledge of Plaintiff's

1    MRSA.

2        When a plaintiff raises an issue in his opposition to a summary judgment motion that is

3    outside the scope of the complaint, the district court should construe this as a request to amend the

4    pleadings out of time, pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, and freely

5    grant such leave to amend.  *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir.

6    2014).  Accordingly, the Court will GRANT Plaintiff leave to amend his complaint to allege that

7    the CDCR Defendants violated his right under the Fourteenth Amendment to receive sufficient

8    information to determine whether to consent to the fistulotomies.

9        **3.       Failure to Treat — CDCR Defendants**

10       Plaintiff contends that his Eighth Amendment rights were violated by the CDCR

11   Defendants' refusal to promptly treat his MRSA with effective antibiotics[12] because the untreated

12   MRSA caused his anal fistula, osteomyelitis of his pelvis, and his pelvic plate infection.  Docket

13   No. 34 at 8–10.  The CDCR Defendants argue that Plaintiff has merely stated a difference of

14   opinion as to his medical treatment, that the medical treatment provided Plaintiff was medically

15   acceptable, and that there is no evidence that the CDCR Defendants acted with disregard for any

16   risk to Plaintiff's health.

17       **a.       Analysis**

18       Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that, at

19   most, Plaintiff's claim against the CDCR Defendants amounts to a difference of opinion as to his

20   medical treatment, which does not rise to the level of a constitutional violation.  "A difference of

21   opinion between a physician and the prisoner—or between medical professionals—concerning

22   what medical care is appropriate does not amount to deliberate indifference."  *Snow v. McDaniel*,

23   681 F.3d 978, 987 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744

24   F.3d 1076, 1082–83 (9th Cir. 2014).  Rather, "[t]o show deliberate indifference, the plaintiff 'must

25

26   ─────────────────────
     [12] Plaintiff does not argue that referring him for a fistulotomy violated his Eighth Amendment
27   rights; rather he argues that a fistulotomy alone could not have cured his MRSA.  Docket No. 34
     at 21 ("[fistulotomy] surgery will not treat, cure or eliminate Plaintiff's MRSA infection. (**If this**
28   **procedure is successful and closes-up [the fistula], the MRSA infection will be present in**
     **Plaintiff if left untreated.**)) (emphasis in original).

show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'"  *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

The CDCR Defendants describe Plaintiff's medical treatment as follows.  Plaintiff was initially diagnosed with a light growth (or colonization) of MRSA, which the CDCR Defendants properly treated by regular monitoring and which the CDCR Defendants properly declined to treat with intravenous antibiotics until Plaintiff showed signs of a severe MRSA infection.  Plaintiff's pelvic plate was infected, possibly a continuation of a 2005 post-operative infection, and this infection, not Plaintiff's MRSA, caused the abscess that became the fistula, which the CDCR Defendants properly treated with fistulotomies.

Plaintiff argues that the June 2012 test results indicated a "serious" and "severe" MRSA infection.  *See* Docket No. 34 at 13, 17.  In stating that his MRSA was serious and severe, Plaintiff uses these terms as a layperson would.  He argues that his MRSA was serious and severe because MRSA is a highly infectious disease, and because the MRSA caused his pelvic plate infection and caused him pain.  *Id.* at 12–13.  However, in stating that Plaintiff did not initially have a severe MRSA infection, the CDCR Defendants are using the term "severe" to denote levels of MRSA infection, as understood in the medical context.  The Federal Bureau of Prisons' Clinical Practice Guidelines defines an MRSA infection as severe if there are signs of systemic infection such as fever, unstable vital signs, "toxic" presentation, streaking from the infection site, crepitus, necrosis, and rapid spread of inflammation over a period of hours.  Docket No. 28-25 at 26.

Whether Plaintiff had a severe MRSA infection starting in June 2012 was a medical diagnosis made by the CDCR Defendants.  The CDCR Defendants' conclusion that Plaintiff's MRSA infection was mild and did not initially require immediate intravenous antibiotics was based on lab results of the infected area and regular physical examinations of Plaintiff.  When Plaintiff was first diagnosed with MRSA in June 2012, the tests only showed a "light growth" of

MRSA.  Docket No. 28-21 at 4.  Although Plaintiff showed signs of cellulitis in late May,[13] at the time of Plaintiff's June 2012 MRSA diagnosis, Plaintiff did not have a skin infection greater than 5 centimeters, nor did he show any other signs of serious infection, such as fever or chills.  Docket No. 28-3 at 20–24.  A November 2012 culture of Plaintiff's infection again showed a "light growth" of MRSA.  Docket No. 28-21 at 10.  On February 9, 2013, Plaintiff reported that he had been suffering fever, chills and sweats for the past couple days; however, the nurse's examination indicated that Plaintiff's temperature was normal (97.2 degrees) and the fistula "looked ok."  Docket No. 28-3 at 41.  Plaintiff did not report having any fever or pain after mid-February 2013.  *See* Docket Nos. 26-5 at 21–22, 26-4 at 4, 28-4 at 7, 11, 17, 20 and 21.  In March 26, 2013, Plaintiff's fistula had extended to 6 cm deep, but a March 2013 culture of Plaintiff's infection showed only a "moderate" growth of MRSA, as did an August 2013 culture.  *Id.* at 16 and 19.  A December 2013 culture showed a "light" growth of MRSA, *id.* at 25, and a February 2014 culture showed a "scant" growth of MRSA.  *Id.* at 31.  Given the record, to the extent that Plaintiff is arguing that the CDCR Defendants misdiagnosed him as having a mild MRSA, this allegation only states a difference of opinion as to diagnosis between a physician and an inmate, which does not rise to the level of a constitutional violation.  *Snow*, 681 F.3d at 987.

Plaintiff also argues that the CDCR Defendants' failure to treat his MRSA with intravenous antibiotics was medically unacceptable because (1) the untreated MRSA caused his fistula and his pelvic plate infection, and (2) the infectious disease specialist stated that antibiotic therapy would need to be intravenous.  However, contrary to Plaintiff's assertion that he was not treated, evidence in the record indicates that the CDCR Defendants pursued numerous treatment options in an effort to address the fistula and prevent infection.  The record indicates that Plaintiff was regularly seen and treated by the CDCR Defendants regarding his MRSA and his fistula (which he alleges is a complication caused by his MRSA) from June 2012, when he was diagnosed with MRSA, to August 15, 2014 when he filed the instant action.  *See* Docket Nos. 28-

---

[13] Plaintiff's perianal abscess was painful, red, swollen, and warm at times.  *See* Docket No. 28-24 at 6 (CCHCS Care Guide listing symptoms of cellulitis areas); Docket No. 34-3 at 9 (May 28, 2012 health care service request wherein Plaintiff states that the perianal abscess had grown, was very hot, and was draining).

United States District Court
Northern District of California

3, 28-4, 28-5, 28-6, 28-7, 28-8, 28-9, 28-10, and 28-9.  Plaintiff was seen multiple times a month by prison medical staff.  Plaintiff received lab tests, x-rays, imaging studies, tests for blood cancer, and a bone biopsy.  Plaintiff received two surgeries.  Plaintiff was seen by outside specialists.  Every medical issue raised by Plaintiff has been given attention by a doctor.  Plaintiff may disagree with the diagnosis or treatment provided but that is not enough to find deliberate indifference on the part of the CDCR defendants.  *See Cunningham v. Belleque*, No. CV-03-1239-MO, 2006 WL 468377, at *3 (D. Or. Feb. 24, 2006) (finding that prison officials' refusal to provide plaintiff with Linezolid to treat his MRSA did not violate Eighth Amendment because plaintiff received timely treatment every time he complained of medical or dental issue, and that Plaintiff's disagreement with diagnosis or treatment plan was insufficient to find deliberate indifference); *cf. Ramirez v. Dayalan*, No. C 08-3766 WHA PR, 2010 WL 3636215, *2 (N.D. Cal. Sept. 14, 2010) ("an MRSA infection on the skin of the type plaintiff suffered may be treated more conservatively with warm soaks and or drainage, or more aggressively with antibiotics") (finding that prison officials had not violated prisoner's Eighth Amendment rights by failing to perform laboratory tests on boils which they suspected were result of MRSA when defendants had taken plaintiff's medical history, evaluated his symptoms, and ordered antibiotics; court noted that antibiotic treatment for MRSA was more aggressive treatment than some doctors would have ordered).

In addition, the evidence in the record supports the CDCR Defendants' allegation that they pursued a medically acceptable course of treatment.  The CDCR Defendants' decision to initially refuse to prescribe intravenous antibiotics for a mild MRSA infection is consistent with both the CCHCS Care Guide and the Federal Bureau of Prison's Clinical Practice Guidelines.  Also, none of Plaintiff's doctors, including outside specialists, recommended intravenous antibiotics until Plaintiff showed signs of a severe infection.

The CCHCS Care Guide recommends that CDCR physicians conservatively treat mild MRSA cases, preferably without antibiotics, and that abscesses be treated with incision and drainage.  Docket No. 34-4 at 1.  The CCHCS Care Guide specifies that vancomycin and linezolid are reserved for treatment of serious MRSA infections.  *Id.* at 2.

Both the Federal Bureau of Prisons ("FBOP") and the Infectious Diseases Society of America make similar recommendations.  The FBOP's Clinical Practice Guidelines states:

> A conservative, mechanical approach should be a component of treatment of most [soft skin tissue infections] SSTIs and is the primary treatment of choice for minor SSTIs (<5 cm) that have no signs of systemic illness.  Most abscesses in the early stages of development can be treated with warm soaks or compresses to promote spontaneous drainage.
> . . .
> *Incision and drainage (I & D)*: Surgical drainage may be required if spontaneous drainage does not occur.
> . . .
> Antibiotic therapy for MRSA should be considered for the following treatment indications: large SSTIs (>5 cm); cellulitis; and with signs of systemic infection and other serious manifestations.
> . . .
> Empiric antibiotic therapy — whether for MRSA or MSSA — should not be prescribed in lieu of more conservative measures such as warm soaks and compresses, and I & D.

Docket No. 34-3 at 56.  Similar to the CCHCS Care Guide, the FBOP also reserves vancomycin and linezolid for treating serious MRSA infections.  The FBOP Guidelines further limit antibiotic treatment to MRSAs that are accompanied by skin infections (or fistula tracts) greater than 5 centimeters, cellulitis, symptoms of serious infection, and other serious manifestations.  Docket No. 34-3 at 56.

The Infectious Diseases Society of America also recommends that no antibiotics be given for a mild abscess.  *See* Stevens et al., Practice Guidelines for the Diagnosis and Management of Skin and Soft Tissue Infections: 2014 Update by the Infectious Diseases Society of America, at 2 available at http://cid.oxfordjournals.org/content/early/2014/06/14/cid.ciu296.full.pdf+html.

When Plaintiff was examined by doctors other than the CDCR Defendants, they also declined to prescribe intravenous antibiotics to treat Plaintiff's MRSA infection.  Docket Nos. 28-9 at 2 (Dr. Rupnik declined to recommend antibiotics) and 28-9 at 15 (Dr. Posson concluded that no antibiotics were indicated at that time).  In finally administering vancomycin to Plaintiff in March 2014, Plaintiff's doctors followed the guidelines set forth in the FBOP Guidelines and the CCHCS Care Guide.  Dr. Posson considered vancomycin in December 2013 when Plaintiff's fistula continued to drain despite the two fistulotomies.  Docket No. 28-8 at 48.  When Plaintiff reported experiencing chills and rigors (sudden feeling of cold with shivering accompanied by a

United States District Court
Northern District of California

1  rise in temperature) for a multi-day period in March 2014, Plaintiff was sent to an outside hospital

2  and started on vancomycin.  Docket Nos. 28-10 at 1–4 and 28-19 at 24–25.

3         Finally, Plaintiff misstates the conclusions and recommendations set forth in the report

4  submitted by the infectious disease specialist, Dr. Rupnik.  Dr. Rupnik neither insisted on

5  intravenous antibiotics nor concluded that Plaintiff's pelvic plate had been infected by the MRSA.

6  After Plaintiff's first telemedicine consult with Dr. Rupnik on January 12, 2014, Dr. Rupnik

7  concluded that it was likely that Plaintiff had a persistent infection in his pelvic plate or screws

8  "with an MRSA fistula developing."  *Id.* at 3–4.  Dr. Rupnik noted that antibiotic therapy would

9  need to be intravenous, but did not recommend antibiotic therapy at that time.  *Id.* at 4.  Dr.

10 Rupnik stated that if the pelvic plate or screws were involved, the only cure for the infection was

11 surgical removal of the plate.  *Id.*  Dr. Rupnik recommended a radiologic fistulogram to track the

12 fistula to its source, additional tests, and a follow-up consultation.  *Id.*  After the February 2014

13 follow-up consultation, Dr. Rupnik recommended that Plaintiff be seen by an orthopedist for a

14 second opinion regarding the pelvic plate infection and return for a second follow-up appointment

15 in April 2014.  *Id.* at 6.  Dr. Rupnik stated that the radiologic evidence also supported the

16 probability of an MRSA plate infection and chronic osteomyelitis.  Dr. Rupnik did not recommend

17 antibiotic therapy, and Dr. Rupnik did not specify whether the MRSA caused Plaintiff's pelvic

18 infection, as Plaintiff alleges, or the pelvic infection caused Plaintiff's MRSA, as the CDCR

19 Defendants allege.

20        In sum, Plaintiff has not raised a triable issue of fact as to whether the treatment provided

21 by the CDCR Defendants was medically unacceptable, or as to whether the CDCR Defendants

22 were deliberately indifferent to his serious medical needs.  The Court therefore GRANTS

23 summary judgment in favor of the CDCR Defendants with respect to Plaintiff's failure to treat

24 claim.

25                    **b.      Qualified Immunity**

26        Even if the Court were to assume that the medical treatment provided by the CDCR

27 Defendants violated Plaintiff's constitutional rights, the CDCR Defendants would be entitled to

28 qualified immunity.  Based on the state of the law between May 2012 and August 2014, the Court

United States District Court
Northern District of California

United States District Court
Northern District of California

1    cannot conclude that, viewing all the facts in the light most favorable to Plaintiff, the CDCR

2    Defendants pursued a clearly unconstitutional course of treatment.  Existing case law concluded

3    that the type of conservative treatment chosen by the CDCR Defendants was not unconstitutional

4    in similar circumstances.  *See Cunningham*, 2006 WL 468377, at *3, *Ramirez*, 2010 WL 3636215,

5    at *2.  In one case, a district court found that the prison officials were entitled to qualified

6    immunity with respect to claims that they had initially refused to treat the prisoner-plaintiff's

7    MRSA with antibiotics and lancing.  *Hall v. Herdner*, No. C08-5013 RJB/KLS, 2008 WL

8    4090026, *6–*7 (W.D. Wash. Aug. 29, 2008).  The Court has not identified any contrary Supreme

9    Court or Ninth Circuit authority, and Plaintiff cites none.

10        Existing precedent does not "place[] beyond debate the unconstitutionality" of the

11   conservative treatment chosen by the CDCR Defendants.  *Taylor*, 135 S. Ct. at 2044 (finding no

12   clearly established right to proper implementation of adequate suicide prevention protocols in

13   correctional facilities; prison officials therefore entitled to qualified immunity for Eighth

14   Amendment claim that they had failed to supervise and monitor the private contractor's suicide

15   screening process for new inmates).  For this reason, the Court finds that, in the alternative, CDCR

16   Defendants are entitled to qualified immunity for their decision not to prescribe intravenous

17   antibiotics earlier to treat Plaintiff's MRSA.  *See Hamby*, 821 F.3d at 1094 (defendants are entitled

18   to qualified immunity where existing case law does not demonstrate that the treatment selected by

19   defendants was indisputably unconstitutional).  The Court GRANTS summary judgment in favor

20   of the CDCR Defendants on Plaintiff's failure to treat claim.

21        **4.      Failure to Treat — Dr. Palmer**

22        Plaintiff alleges that Dr. Palmer's medical care violated the Eighth Amendment because

23   Dr. Palmer failed to treat his fistula as follows:  Dr. Palmer failed to treat Plaintiff's MRSA, which

24   Plaintiff alleges was the cause of his fistula; Dr. Palmer's fistulotomies "failed," Docket No. 34 at

25   20; and Dr. Palmer refused to prescribe Plaintiff antibiotics as part of the post-op treatment,

26   Docket No. 34-1 at 4.  Dr. Palmer alleges that his assessment, treatment, and follow-up care of

27   Plaintiff were well-reasoned and appropriate.  Dr. Palmer provides an expert opinion from Dr.

28

1    Macho[14] that reaches the same conclusion.  Docket Nos. 26-2 at 7–8; 26-4 at 4–5; 26-14 at 10–11.

2          The following facts are undisputed:  Dr. Palmer is a surgeon employed by the County of

3    Monterey, and not employed by the CDCR.  Plaintiff was referred to Dr. Palmer solely for

4    evaluation of Plaintiff's abscess.  Docket No. 26-2 at 7.  After examining Plaintiff, Dr. Palmer

5    recommended a fistulotomy.  Docket Nos. 26-4 at 3 and 26-5 at 26–28.  Dr. Birdsong submitted a

6    request for the recommended fistulotomy, which prison officials approved on December 20, 2012.

7    Docket No. 28-15 at 5.  These undisputed facts establish that Dr. Palmer was not responsible for

8    treating Plaintiff's MRSA and was only authorized to treat a specific medical issue with a specific

9    medical procedure.  Moreover, Plaintiff provides the Court with no evidence that Dr. Palmer was

10   aware of Plaintiff's MRSA other than Plaintiff's conclusory assertion that because Dr. Palmer

11   states in his declaration that he obtained Plaintiff's medical history, Dr. Palmer knew of his

12   MRSA.  This assertion appears to rely on a misunderstanding of the record.  The record shows that

13   Dr. Palmer obtained a medical history *from* Plaintiff at their first meeting on December 18, 2012.

14   Docket Nos. 26-2 at 7, 26-4 at 3, and 26-5 at 26–28.  In other words, Dr. Palmer questioned

15   Plaintiff about his medical history and prepared a treatment plan based upon Dr. Palmer's physical

16   examination of Plaintiff and the medical history that Plaintiff provided.  Accordingly, to the extent

17   that Plaintiff alleges that Dr. Palmer failed to treat his MRSA and failed to provide him post-

18   operative antibiotics to address his MRSA, summary judgment is entered in favor of Dr. Palmer

19   with respect to these claims.

20          With respect to Plaintiff's allegation regarding Dr. Palmer's fistulotomies, Plaintiff has not

21   provided any evidence, even circumstantial, from which it may be reasonably inferred that Dr.

22   Palmer violated Plaintiff's constitutional rights in performing partial fistulotomies.  To make out

23   _____

24   [14] Plaintiff's motion to strike the declaration of James Macho, M.D. is DENIED.  Docket No. 35.
     Plaintiff claims that Dr. Macho committed perjury in his declaration because a declaration must be
25   based on personal knowledge and Dr. Macho has no personal knowledge of Plaintiff's treatment
     and bases his declaration on information obtained from sources such as medical records.  Dr.
26   Macho's declaration is intended as an expert opinion to support Dr. Palmer's summary judgment
     motion.  In stating that "the foregoing is true and correct," it is clear that to the extent that Dr.
27   Macho sets forth Plaintiff's medical history, he is stating that it is true and correct that this medical
     history is what is set forth in Plaintiff's medical records from Natividad Medical Center, Queen of
28   the Valley Hospital, Salinas Valley State Prison, Donovan Correctional Facility, and Dr. Palmer's
     declaration and the related exhibits.  Docket No. 26-14 ("Macho Decl.") at 4–6.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    an Eighth Amendment violation, there must be a purposeful act or failure to act on the part of the

2    defendant and resulting harm.  *See McGuckin*, 974 F.2d at 1060.  There is no evidence in the

3    record that Dr. Palmer deliberately failed at performing the fistulotomies.  To the extent that

4    Plaintiff is arguing that Dr. Palmer was incapable of performing the fistulotomies, this only states

5    a claim of medical malpractice or negligence, both of which are insufficient to make out a

6    violation of the Eighth Amendment.  *See Toguchi v. Chung,* 391 F.3d 1051, 1060–61 (9th Cir.

7    2004) ("showing of medical malpractice or negligence is insufficient to establish a constitutional

8    deprivation under the Eighth Amendment").  While deliberate indifference may be shown where

9    access to medical staff is meaningless as the staff is not competent and does not render competent

10   care, *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (summary judgment reversed

11   where medical staff and doctor knew of head injury, disregarded evidence of complications to

12   which they had been specifically alerted, and, without examination, prescribed contraindicated

13   sedative), there is no evidence in the record from which it can be inferred that Dr. Palmer did not

14   render competent care.  Dr. Macho, the expert witness, testified that it is not unusual for a complex

15   anal fistula such as Plaintiff's to require prolonged wound care and more than one surgical

16   procedure before healing.  Docket No. 26-14 at 7.  In addition, Dr. Macho opined that the fistula

17   most likely persisted because of an infection in Plaintiff's pelvic hardware, information which was

18   not known to Dr. Palmer during his treatment of Plaintiff and information which was discovered

19   because Dr. Palmer ordered a radiologic imaging study to further assess the fistula after it failed to

20   heal.  Docket No. 26-14 at 11.  Finally, Dr. Macho concluded that it was necessary to remove

21   Plaintiff's infected pelvic plate in order to successfully address Plaintiff's anal fistula.  *Id.*

22        The record also indicates that Dr. Palmer made persistent efforts to address Plaintiff's

23   fistula.  He performed two separate surgical procedures on Plaintiff, saw Plaintiff at sixteen

24   outpatient visits over the course of fourteen months, and recommended radiographic testing when

25   Plaintiff's fistula failed to heal.  Docket No. 26-5.

26        In addition, assuming arguendo that the fistulotomies were failures, the alleged failed

27   fistulotomies did not cause the harm alleged:  the continued MRSA and the resulting pelvic plate

28   infection.  Plaintiff himself states that even a successful fistulotomy could not have addressed his

1    MRSA, and that the MRSA could only be addressed by intravenous antibiotics.  Docket No. 34 at

2    21.

3           Based on the record before the Court, the Court finds that there no triable issue of fact as to

4    whether Dr. Palmer's partial fistulotomies constituted deliberate indifference to Plaintiff's serious

5    medical needs.  The Court GRANTS summary judgment in favor of Dr. Palmer with respect to

6    Plaintiff's failure to treat claim.

7                                          **CONCLUSION**

8           For the foregoing reasons, the Court orders as follows:

9           1.       The Court GRANTS the CDCR Defendants' summary judgment motion.  Docket

10   No. 29.

11          2.       The Court GRANTS Dr. Palmer's summary judgment motion.  Docket No. 26.  Dr.

12   Palmer is terminated from this action.

13          3.       The Court grants Plaintiff leave to file an amended complaint alleging that the

14   CDCR Defendants violated his right under the Fourteenth Amendment claim to receive sufficient

15   information to determine whether to consent to the fistulotomies, and alleging the two state-law

16   claims which Plaintiff raises for the first time in his opposition to the summary judgment motions:

17   that the CDCR Defendants violated his common-law right of informed consent and that the CDCR

18   Defendants violated his liberty right to be free from "the terror of instant and unexpected death,"

19   *see* Docket No. 34 at 27–28 and 29–30.  Plaintiff is reminded that an amended complaint

20   supersedes the original complaint.  *London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir.

21   1981) ("plaintiff waives all causes of action alleged in the original complaint which are not alleged

22   in the amended complaint.").

23          If Plaintiff wishes to file this amended complaint, he must do within **thirty (30)** days of the

24   date of this order.  The pleading must be simple and concise and must include the caption and civil

25   case number used in this order (14-3716 HSG (PR)) and the words AMENDED COMPLAINT on

26   the first page.  The Clerk of the Court shall send Plaintiff a blank civil rights form along with his

27   copy of this order.

28          If Plaintiff fails to file a proper amended complaint within the designated time, the Court

United States District Court
Northern District of California

1    will dismiss the CDCR Defendants from this action with prejudice and close this case.

2         This order terminates Docket Nos. 26 and 29.

3         **IT IS SO ORDERED.**

4    Dated: 9/29/2016

5

6                                    HAYWOOD S. GILLIAM, JR.
                                     United States District Judge
7

8