UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES GREGORY CALLION, <br> Plaintiff, <br> v. <br> EDWARD BIRDSONG, et al., <br> Defendants. | Case No. 14-cv-03716-HSG <br><br> **ORDER GRANTING DEFENDANT MACK'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE AGAINST DEFENDANT BIRDSONG** <br><br> Re: Dkt. No. 55 |

## INTRODUCTION

Plaintiff, a California prisoner currently incarcerated at R.J. Donovan Correctional Facility, filed this *pro se* civil rights action under 42 U.S.C. § 1983. Now pending before the Court is Dr. Mack's second summary judgment motion. Dkt. No. 55. Plaintiff has filed an opposition and related documents, Dkt. Nos. 64, 65, and 66; and Dr. Mack has filed a reply, Dkt. No. 68. For the reasons set forth below, the Court GRANTS Dr. Mack's summary judgment motion and DISMISSES Dr. Birdsong from this action.

## PROCEDURAL BACKGROUND

Plaintiff was previously incarcerated at Salinas Valley State Prison ("SVSP"). In his initial complaint (Dkt. No. 1), he alleged that, during his incarceration at SVSP, Natividad Medical Center ("NMC") Dr. Barron Palmer and SVSP doctors Birdsong, Mack, Bright, Dunlap, and Adams were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. On September 29, 2016, the Court granted Dr. Palmer's summary judgment motion and dismissed him from this action with prejudice. Dkt. No. 38. The Court also granted the summary judgment motion filed by Drs. Birdsong, Mack, Bright, Dunlap, and Adams, but granted Plaintiff leave to file an amended complaint against these defendants alleging a Fourteenth

1 Amendment informed consent claim, a state-law informed consent claim, and a state-law liberty

2 claim. Dkt. No. 38.

3 Plaintiff filed an amended complaint (Dkt. No. 39), which the Court found stated a cognizable claim against Drs. Birdsong and Mack for violating Plaintiff's Fourteenth Amendment right to receive sufficient information to intelligently exercise his right to refuse unwanted medical treatment (Dkt. No. 45). The Court found that Plaintiff had not stated cognizable claims against Drs. Dunlap, Bright or Adams (Dkt. No. 45), and later dismissed these defendants per Plaintiff's request (Dkt. No. 47).

On February 10, 2017, counsel for Dr. Birdsong filed a notification of Dr. Birdsong's death and indicated that counsel for Dr. Birdsong did not represent Dr. Birdsong's estate. Dkt. No. 54. The Court ordered Plaintiff to locate Dr. Birdsong's successors or representatives and file a motion for substitution within ninety days, or face dismissal of Dr. Birdsong, as required by Rule 25(a)(1) of the Federal Rules of Civil Procedure. Dkt. No. 57. Plaintiff filed a motion for substitution (Dkt. No. 58), which the Court denied without prejudice because Plaintiff failed to identify any successors or representatives of Dr. Birdsong that he wished to substitute for Dr. Birdsong (Dkt. No. 60). Plaintiff has not filed any other motions for substitution.

**FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise noted.

In 2005, prior to being incarcerated, Plaintiff was involved in a serious car accident which fractured his pelvis in six places. Dkt. No. 55-2 at 34. A plate and four screws were surgically implanted to stabilize his pelvis. *Id.* Plaintiff also had a severe post-operative infection that required additional surgery and took two years to heal. *Id.*

**A. Medical Treatment from April 2012 to April 2013**

When Plaintiff arrived at SVSP in April 2012, his medical records reflected the plate and screws in his pelvis. Dkt. No. 64 at 1. Upon arriving at SVSP, Dr. Birdsong was assigned as Plaintiff's primary care physician. Upon arrival, Plaintiff complained that a small bump on the left side of his buttocks was causing him pain. Dkt. No. 39 at 5 and Dkt. No. 55-2 at 3. As the months passed, the bump remained painful and grew in size. Dkt. No. 39 at 5 and Dkt. No. 55-2

2

at 3 and 5.

On May 30, 2012, Dr. Tuvera incised and drained the bump on the left buttock. He also took a tissue sample for biopsy and culture. Dkt. No. 55-2 at 5. The sample tested positive for a light growth of MRSA (Methicillin-resistant staphylococcus aureus) that was resistant to various antibiotics. Dkt. No. 55-2 at 41. SVSP medical staff did not inform Plaintiff of these results. Plaintiff was aware of the biopsy but did not ask about the results. Dkt. No. 55-3 at 11–19. Plaintiff assumed that the medical staff would inform him of any relevant test results. Dkt. No. 55-2 at 12.

On November 27, 2012, Plaintiff was examined by Dr. Birdsong in response to his complaint that the lesion left by the incision continued to drain. Dkt. No. 55-2 at 6. Dr. Birdsong's progress note for this appointment indicates that he suspected an anal fistula, and that he referred Plaintiff for a surgical consult. Dkt. No. 55-2 at 6. Dr. Birdsong took another tissue sample from the lesion for testing, but did not explain to Plaintiff why he was taking a tissue sample. Dkt. No. 55-3 at 18–20. Dr. Birdsong did not mention the May 2012 biopsy, and Plaintiff did not bring it up. However, Plaintiff asserts that he is sure that Dr. Birdsong knew about the earlier biopsy because the doctors "usually communicate with each other." Dkt. No. 55-3 at 17. Plaintiff assumed that the earlier biopsy had revealed the anal fistula but remained unaware that his fistula had a light growth of MRSA. Dkt. No. 55-3 at 18.

On December 6, 2012, Dr. Birdsong received the results of the November 2012 biopsy which again indicated that the lesion had a light growth of multi-drug resistant MRSA. Dkt. No. 55-2 at 42. That same day, Dr. Birdsong filled out a Notification of Diagnostic Test Results form, which is used to let inmates know whether their test results are within normal limits. Dkt. No. 55-6 at 4 and 10. The form has four options for the physician to check off: (1) test results within normal limits and no physician follow-up is required; (2) scheduling inmate for a follow-up medical appointment; (3) ordering a repeat test; and (4) scheduling a chronic care appointment. Dkt. No. 55-6 at 10. Dr. Birdsong checked the box indicating that Plaintiff would be scheduled for a follow-up medical appointment, and met with Plaintiff that same day to discuss the lab results. Dr. Birdsong's notes that for appointment indicate that Dr. Birdsong was aware that

3

Plaintiff's lesion was colonized with MRSA and was still draining; and that Dr. Birdsong prescribed Rifampin, an antibiotic to which Plaintiff's MRSA was sensitive. Dkt. No. 55-6 at 4 and 10–11.

On December 18, 2012, pursuant to Dr. Birdsong's request for a surgery consult, Plaintiff was seen by Dr. Palmer. Dkt. No. 55-2 at 7. Dr. Palmer diagnosed an anal fistula and recommended a colonoscopy and fistulotomy. Dkt. No. 55-2 at 7. As part of the pre-surgery protocol, Dr. Palmer ordered the discontinuation of all antibiotics including the Rifampin. Dkt. No. 55-2 at 7 and Dkt. No. 55-6 at 12.

In January 2013, Dr. Palmer performed surgery on Plaintiff and removed a large fibrous tract, but was unable to locate the internal opening of the fistula. Dkt. No. 55-2 at 20–22. A sample of Plaintiff's perianal tissue was tested and confirmed as consistent with an anal fistula. Dkt. No. 55-2 at 23. There is no indication that the tissue was tested for MRSA. Dkt. No. 55-2 at 23. Prior to the surgery, Plaintiff signed a form titled "Verification of Informed Consent to Surgery or Special Procedure." Dkt. No. 55-2 at 19. According to the form, by signing, Plaintiff indicated that he understood the form; that Dr. Palmer had adequately explained the surgery, along with the risks, benefits, and other information described in the form; that Plaintiff had a chance to ask Dr. Palmer questions; that Plaintiff had received all information desired concerning the operation; and that Plaintiff had consented to the procedure. Dkt. No. 55-2 at 19.

### C.  Medical Treatment by Dr. Mack from April 2013 Onwards

In April 2013, Dr. Mack took over from Dr. Birdsong as Plaintiff's primary care physician. Dkt. No. 39 at 5. On April 19, 2013, Dr. Mack was notified by a nurse that Plaintiff's fistula contained to drain. Dkt. 55-4 ("Mack Decl."), ¶ 5. In response, Dr. Mack filled out a request for services to have Plaintiff seen by Dr. Palmer for a follow-up appointment, and noted in Plaintiff's medical records that Dr. Palmer's plan was to examine the fistula under anesthesia and possibly perform another fistulotomy. Mack Decl., ¶ 5 and Dkt. No. 55-2 at 16.

On May 14, 2013, Dr. Kumar examined Plaintiff and prescribed him Clindamycin and Ciprofalxin to address the increased drainage of pus from the fistula. Mack Decl., ¶ 6 and Dkt. No. 55-2 at 11.

4

On May 21, 2013, Dr. Mack examined Plaintiff. Mack Decl., ¶ 6. The parties disagree as to whether, at this appointment, Dr. Mack informed Plaintiff of the MRSA that had colonized his anal fistula. According to Plaintiff, Dr. Mack stated that the reason the fistula infection had not yet healed was because the infection was resistant to antibiotics. Plaintiff further alleges that Dr. Mack failed to specify that Plaintiff had tested positive for MRSA and failed to discuss the earlier biopsy results with him. Dkt. No. 55-3 at 22.

Dr. Mack disputes Plaintiff's recollection of the appointment. While Dr. Mack does not specifically recall the examination, he states that he is sure that he would have discussed everything memorialized in the progress notes for the appointment, including the finding that Plaintiff's anal fistula was colonized with multi-drug resistant MRSA. Mack Decl., ¶ 6. Dr. Mack's progress note for this appointment reported that Plaintiff's March 7, 2013 culture tested positive for Clindamycin and Bactrim resistant MRSA. Dkt. No. 55-2 at 10. Dr. Mack's progress note also reported that Plaintiff's follow-up appointment with Dr. Palmer had not been scheduled. The progress note also reports that Dr. Mack called the scheduler twice in order to secure a follow-up appointment for the following week, and indicated that the appointment might include a fistulotomy. Dkt. No. 55-2 at 10. Dr. Mack states that he was unaware that Dr. Palmer did not know of Plaintiff's MRSA. Mack Decl., ¶ 6.

At this stage, the Court views the evidence in the light most favorable to Plaintiff, and resolves any conflicts in the evidence in his favor.

On May 30, 2013, Dr. Palmer performed a second fistulotomy on Plaintiff, and Plaintiff again signed the same informed consent form prior to the surgery. Dkt. No. 55-2 at 25. Dr. Palmer also reported discussing with Plaintiff, prior to the surgery, the surgery's risks, benefits, and possible complications. Dkt. No. 55-2 at 26. During the surgery, granulated tissue was removed and a fibrous capsule was cauterized. Dkt. No. 55-2 at 26–28.

On June 12, 2013, Dr. Mack saw Plaintiff for a dressing change and briefly examined Plaintiff's fistula. Mack Decl., ¶ 7. Dr. Mack did not observe any signs of an active infection. Mack Decl., ¶ 7. The nurse noted that there was a "small serosang drainage" which Dr. Mack concluded was consistent with a healing fistula. Mack Decl., ¶ 7.

5

On July 7, 2013, Plaintiff submitted a healthcare appeal form where he complained that he had not received appropriate treatment for the bump on his left buttock, and complained that he had been misdiagnosed. Dkt. No. 55-2 at 43–44. In his grievance, Plaintiff stated that in reviewing his medical records, he had learned that the results of the May 2012 biopsy indicated that his fistula was infected with bacteria resistant to the antibiotics prescribed:

> . . . during a routine check of my medical records, it was discovered the biopsy results taken 11 mos earlier showed the antibiotics I was given were useless. As the fistula infection was resistant due to it being severely infected with bacteria. Had anyone checked the results 11 mos before, they would have known this and a different more effective treatment could have been ordered.

Dkt. No. 55-2 at 44.

On August 9, 2013, Dr. Mack met with Plaintiff in response to the grievance. Mack Decl., ¶ 8. Dr. Mack noted that Plaintiff had a mild to moderate drainage from his fistula that was mostly serous but with some purulence, which meant that the wound was mainly healing normally although there were some signs of an infection. Mack Decl., ¶ 8. Dr. Mack decided to re-culture the wound to determine whether any bacteria remained in the fistula post-surgery. Mack Decl., ¶ 8.

On August 16, 2013, Dr. Mack again examined Plaintiff. Dr. Mack discussed with Plaintiff the result of the wound culture, which indicated that Plaintiff now had a moderate growth of MRSA. Mack Decl., ¶ 9. Plaintiff claims that this is the first time that Dr. Mack informed him that he had been diagnosed with an MRSA infection. Dkt. No. 55-3 at 21 and Dkt. No. 64 at 15. Dr. Mack prescribed Zyvox, an antibiotic to which Plaintiff's MRSA was sensitive. Mack Decl., ¶ 9.

**D.       Medical Treatment from August 2013 Onwards; Discovery of Pelvic Infection**

Plaintiff had additional follow-up appointments with Dr. Palmer. On October 8, 2013, because the fistula tract had not fully healed five months after the second fistulotomy, Dr. Palmer recommended further examination of the wound under anesthesia. Docket Nos. 26-4 at 7 and 26-5 at 7. On October 22, 2013, Dr. Palmer noted that the drainage from the fistulous tract was increasing, and that the tract extended beyond 10 cm. Dr. Palmer diagnosed Plaintiff with a persistent complex anal fistula and recommended further efforts to locate the source of the fistula

6

tract, specifically an MRI of the pelvis to determine whether there were undrained extensions or abscesses that required additional procedures. Docket No. 26-5 at 6 and Docket No. 36-5 at 5.

On November 7, 2013, an MRI was performed but the results were inconclusive. Docket No. 28-8 at 38. A CT scan of Plaintiff's pelvis was recommended. Docket No. 28-8 at 38.

On January 21, 2014, Plaintiff had a telemedicine consult with Dr. Rupnik, an infectious disease specialist at Queen of the Valley Medical Center, who recommended a radiologic fistulogram to track the fistula to its source. Docket No. 28-20 at 2–4.

On January 25, 2014, Plaintiff had a CT scan at an outside hospital which showed a fistula in the suprapubic abdominal wall. Docket No. 28-18 at 61–62. On January 27, 2104, after examining Plaintiff and reviewing the CT scan, Dr. Posson speculated that the abdominal fistula was likely caused by the 2005 postoperative infection and surgical drains. Docket No. 28-9 at 10–11.

On February 18, 2014, Plaintiff had a telemedicine consult with Dr. Rupnik. Docket No. 28-20 at 5–6. Dr. Rupnik's impression was that the radiologic evidence "support[ed] the possibility of an MRSA plate infection and chronic osteomyelitis." Docket No. 28-20 at 6.

At medical examinations on February 25 and 26, 2014, doctors opined that Plaintiff's MRSA was likely caused by an infection surrounding the pelvic plate that had persisted for several years, and then recently fistulized out to the perirectal area and also the supraumbilical area. Docket No. 28-9 at 28 and 30.

## DISCUSSION

**A.   Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing

7

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**B. Analysis**

Plaintiff argues that his Fourteenth Amendment due process right to informed consent was violated when Dr. Mack failed to inform him of his MRSA prior to his fistulotomies because, without a complete understanding of his medical condition, Plaintiff was unable to intelligently exercise his right to accept or refuse the fistulotomy. Plaintiff claims that had he known that his fistula was colonized with MRSA, he would have refused the fistulotomy and sought treatment that addressed the MRSA because the MRSA was the cause of the related fistula. Dr. Mack denies that he committed any constitutional violation and, in the alternative, argues that he is entitled to qualified immunity.

**1. Legal Standard**

The Due Process Clause of the Fourteenth Amendment protects individuals against governmental deprivations of "life, liberty or property," as those words have been interpreted and

given meaning over the life of our republic, without due process of law. *Board of Regents v. Roth*, 408 U.S. 564, 570–71 (1972). The Due Process Clause confers both procedural and substantive rights. *See Armendariz v. Penman*, 75 F.3d 1311, 1318 (9th Cir. 1996). Substantive due process refers to certain actions that the government may not engage in, no matter how many procedural safeguards it employs. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Blaylock v. Schwinden*, 862 F.2d 1352, 1354 (9th Cir. 1988).

The Ninth Circuit has held that the Fourteenth Amendment provides for the right to be "free from unjustified intrusions into the body." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (citing *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). That right includes the right "to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently." *Id.* (citing *White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990)); *see also White*, 897 F.2d at 113 ("A prisoner's right to refuse treatment is useless without knowledge of the proposed treatment. Prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment, as well as a reasonable explanation of the viable alternative treatments that can be made available in a prison setting."); *Pabon v. Wright*, 459 F.3d 241, 250 (2d Cir. 2006) ("[T]here exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment.").

### 2. Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller*

*v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

With respect to the second prong of the qualified immunity analysis, the Supreme Court has recently held that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation and internal quotation marks omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation and internal quotation marks omitted). In conducting this analysis, the Court must determine whether the pre-existing law provided defendants with "fair notice" that their conduct was unlawful. *Id.* at 1777.

Although it is not necessary that a prior decision rule "the very action in question" unlawful for a right to be clearly established, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), the Supreme Court has repeatedly cautioned that courts should not define clearly established law at a high level of generality, *see White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *see also Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) (plaintiff need not find case with identical facts, but the further afield existing precedent lies the more likely that official's acts fall within vast zone of conduct that is constitutional).

10

It is unclear whether a court may consider binding circuit precedent in determining clearly established law. The Ninth Circuit has defined "clearly established law" as Supreme Court and circuit precedent. *See Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010) ("To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act.") (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)); *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (same). In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court relied on circuit precedent in finding that the defendants were entitled to qualified immunity. *Hope*, 536 U.S. at 741–45 ("in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post, we readily conclude that the respondents' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"). In recent cases, the Supreme Court has assumed for the sake of argument, without explicitly holding, that "controlling Court of Appeals' authority could be a dispositive source of clearly established law," *Reichle v. Howards*, 132 S.Ct. 2088, 2094 (2012). *See also Carroll v. Carman*, 135 S.Ct. 348, 350 (2014). But neither of these cases overruled *Hope* or called its reliance on circuit precedent into question.

### 3. Analysis

It is undisputed that Dr. Mack did not become Plaintiff's primary care physician until April 2013, after the January 2013 fistulotomy. Accordingly, the question is whether Dr. Mack violated Plaintiff's Fourteenth Amendment right to be provided with the information reasonably necessary to make an informed decision to accept or reject the May 30, 2013 fistulotomy.

Dr. Mack makes the following arguments: (1) there is no clearly established right to be affirmatively informed of the exact bacteria causing an infection prior to referral to a surgeon; (2) he informed Plaintiff of the light growth of MRSA on May 21, 2013, prior to the May 30, 2013 fistulotomy; (3) he did not intentionally withhold any material information; (4) a reasonable patient's knowledge that he has MRSA would not influence his decision to have surgery; and (5) given the information that Plaintiff had available to him, Plaintiff's failure to ask about the MRSA precludes a due process violation. Dkt. No. 55.

11

Plaintiff makes the following arguments: (1) his light growth of multi-drug resistant MRSA was material to deciding whether a fistulotomy was appropriate because a fistulotomy could not have resolved an anal fistula colonized by MRSA; (2) Dr. Birdsong and Dr. Mack deliberately concealed Plaintiff's MRSA; (3) Plaintiff's health issues, including the anal fistula, were caused by a persistent infection in his pelvic plate and a fistulotomy could not have addressed the anal fistula; (4) prison regulations have clearly established that prison medical staff must promptly disclose critical medical information such as MRSA. Dkt. No. 64.

Having carefully reviewed the record and making all reasonable inferences in favor of Plaintiff, *see Tolan v. Cotton*, 134 S. Ct. 1861, 1863, 1866 (2014) ("under either prong [of the qualified immunity analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment"), the Court concludes that Dr. Mack is entitled to qualified immunity.

For purposes of the qualified immunity analysis, the Court will presume that, on May 21, 2013, prior to the second fistulotomy, Dr. Mack informed Plaintiff that the anal fistula was infected with a bacteria that was resistant to various antibiotics, and will presume that Dr. Mack did not inform Plaintiff that the bacteria was MRSA until after the second fistulotomy. However, the record does not support a reasonable inference that Dr. Mack deliberately concealed Plaintiff's MRSA. Plaintiff presents no evidence that Dr. Mack deliberately concealed the MRSA diagnosis other than the conclusory allegation in his pleadings which is insufficient to create a genuine issue of fact, especially where Plaintiff acknowledges that Dr. Mack was forthcoming that Plaintiff had antibiotic-resistant bacteria. *See Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) ("conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient [to create a genuine issue of fact]") (citation omitted). The record also does not support a reasonable inference that Plaintiff's MRSA rendered a fistulotomy inappropriate in May 2013. Plaintiff argues that because the infection was caused by the infected pelvic plate, only removal of the pelvic plate could have addressed the fistula and the MRSA. However, this argument relies on information — pelvic plate infection — that was not available to Plaintiff's doctors at the time of the fistulotomy. The record indicates that Plaintiff's physicians, despite being aware of Plaintiff's MRSA, did not suspect the pelvic plate was infected until October 22,

12

2013 at the earliest, and medical tests did not indicate, or confirm, infection of the pelvic plate until early 2014. At the time the fistulotomy was recommended (December 2012 through May 2013), there was no indication that there was an infected pelvic plate, and, at that time, a fistulotomy was the appropriate treatment for Plaintiff's anal fistula. *See* Dkt. No. 55-5 ("Macho Decl.") at 5–10 (February 14, 2014 fistulagram was the first conclusive indication that Plaintiff had an infection in his pelvic plate; discussing appropriate treatment for fistulas).

Accordingly, for the purposes of qualified immunity, the relevant question is whether, from April through May 2013, it was clearly established that Dr. Mack was required to specify that Plaintiff's antibiotic-resistant bacteria was MRSA prior to Plaintiff undergoing the fistulotomy. In conducting this analysis, the Court bears in mind the Supreme Court's recent and repeated exhortations to undertake the qualified immunity inquiry "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted).

There is no Supreme Court precedent prior to — or after — May 30, 2013 discussing the level of specificity required for informed consent.[1] A search of Ninth Circuit cases also reveals no opinions prior to — or after — May 30, 2013 addressing this issue. The Supreme Court and Ninth Circuit cases cited by Plaintiff — *Washington v. Harper*, 494 U.S. 210 (1990); *Riggins v. Nevada*, 504 U.S. 127 (1992); *Benson v. Terhune*, 304 F.3d 874 (9th Cir. 2002) — involve different factors and would not have placed Dr. Mack on notice that he was required to specify that the antibiotic-resistant infection was MRSA prior to Plaintiff undergoing the fistulotomy.[2]

---

[1] Plaintiff misunderstands the standard for determining whether a right is clearly established for the purposes for the qualified immunity analysis. He argues that state prison regulations "clearly established" that prison officials must disclose critical medical information, such as MRSA infections. Dkt. No. 64 at 13–17. "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision [whether the provision does not give rise to the cause of action at issue]." *Davis*, 468 U.S. at 194. Plaintiff's cause of action arises out of the Fourteenth Amendment, not out of prison regulations.

Also, as discussed *supra*, for purposes of assessing a claim of qualified immunity, a right is "clearly established" only if, at the time of the alleged act, Supreme Court or Ninth Circuit authority clearly established that particular right. *Community House, Inc.*, 623 F.3d at 967.

[2] Plaintiff also cites to cases that he argues hold that MRSA constitutes a serious medical need. Dkt. No. 64 at 8 (citing to *Sansome v. Lopez*, 2013 WL 3198594, at *4 (E.D. Cal. 2014); *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724 (6th Cir. 2015); and *Amason v. Wedell*, 2014 WL 2987695, at

*Washington*, *Riggins*, and *Benson* address whether medications can be administered without the inmate's consent. In *Washington*, the Supreme Court recognized that the Due Process Clause conferred a liberty interest in avoiding unwanted administration of antipsychotic drugs, but held that, given the requirements of the prison environment, the Due Process Clause allowed prison officials to treat an inmate with serious mental illness against his will if the inmate was dangerous to himself or others and if the treatment was in the inmate's medical interest. *Harper*, 494 U.S. at 226–27. In *Riggins*, the Supreme Court relied on *Harper* and reached a similar conclusion, finding that due process would not be violated where the forced administration of antipsychotic medication was medically appropriate and essential for the safety of the inmates and others. *Riggins*, 504 U.S. at 134–35.

The leading Ninth Circuit case regarding informed consent, *Benson v. Terhune*, 304 F.3d 874 (9th Cir. 2002), also dealt with the administration of psychotropic medication. In *Benson*, the petitioner, a pre-trial detainee, sought habeas relief on the grounds she had been forced to ingest psychotropic medication in violation of her Fourteenth Amendment due process right, and that trying her under such circumstances violated her Sixth and Fourteenth Amendments rights to a fair trial. The petitioner acknowledged that she had requested medications for her various health issues, but argued that her taking the medication was neither truly voluntary nor consensual because she "had no choice but to take the [specific] medications the jail staff prescribed—both in kind and in dosage—and was not given information about whether to take them." *Id.* at 880. The Ninth Circuit found that even though the petitioner was not fully informed about the nature, dosage and effects of the medication given, a finding of involuntariness was precluded in this particular context where the petitioner had personal knowledge of drugs from her own prior usage, the petitioner had trained as a practical nurse, the petitioner did not ask for further information regarding the drugs, and the drugs ingested did not render the petitioner mentally incapable of refusing treatment. *Id.* at 884–85. The Ninth Circuit further found that, in this context, the jail

---

\*3 (E.D. Cal. 2014)). Whether Plaintiff's MRSA is a serious medical need is relevant to an Eighth Amendment deliberate indifference claim, but is unrelated to a due process informed consent claim.

14

staff had no affirmative duty to volunteer information about the drugs.

None of these three cases clearly establish that a physician has a duty to specify that an inmate's antibiotic-resistant bacteria is MSRA prior to the inmate agreeing to a fistulotomy. These cases addressed the right for informed consent in the context of administration of psychotropic drugs.

Plaintiff cites out-of-circuit cases that he claims establish such a duty for physicians. However, out-of-circuit cases do not constitute clearly established law for qualified immunity purposes. *See Community House, Inc.,* 623 F.3d at 967 ("To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act.") (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). Even assuming that it may look to out-of-circuit cases in determining whether the law was clearly established, the Court disagrees that these cases establish that Plaintiff's Fourteenth Amendment right to informed consent required Dr. Mack to specify that Plaintiff had MRSA when Dr. Mack had already disclosed that Plaintiff had antibiotic-resistant bacteria.

Plaintiff cites to *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990), but *White* holds that "[p]risoners have a right to such information as is *reasonably necessary* to make an informed decision to accept or reject proposed treatment, as well as a reasonable explanation of the viable alternative treatments that can be made available in a prison setting." *White*, 897 F.2d at 113 (emphasis added). The Third Circuit also placed restrictions on the informed consent obligation, noting that, in the context of forced treatment, "[c]ourts are ill-equipped to specify the medical information that must be provided to prison patients" and holding that a "prison doctor's decision to refuse to answer an inmate's questions about treatment will be presumed valid unless it is such a substantial departure from professional judgment, practice or standards as to demonstrate that the doctor did not base the decision on such a judgment." *Id. White* is inapplicable to the instant action because, here, the record does not support a finding that it was reasonably necessary for Plaintiff to know that his antibiotic-resistant bacterial infection was MRSA in order to accept or reject the fistulotomy.

Plaintiff also cites to *Pabon v. Wright*, 459 F.3d 241, 250 (2d Cir. 2006). In *Pabon*, the

prisoner alleged that prison official defendants were entitled to qualified immunity with respect to the inmate's Fourteenth Amendment claim that he had been denied the necessary medical information regarding his liver biopsy and related medication. The Second Circuit specified that

> [i]nadvertent failures to impart medical information cannot form the basis of a constitutional violation. The simple lack of due care does not make out a violation of either the substantive or procedural aspects of the Due Process Clause of the Fourteenth Amendment.

*Pabon*, 459 F.3d at 250. The Second Circuit ultimately found that there was no clearly established right to medical information at the time of the inmate's 1997 medical treatment and also rejected the inmate's argument that the later case, *Benson v. Terhune*, had clearly established such a right. *Id.* at 254–55.

Because there is no binding precedent establishing that the Fourteenth Amendment right to informed consent required Dr. Mack to specify that Plaintiff's antibiotic-resistant bacteria was MSRA prior to Plaintiff agreeing to a fistulotomy, the Court cannot conclude that "existing precedent . . . placed the . . . constitutional question beyond debate." *Sheehan*, 135 S. Ct. at 1774; *see*, *e.g.*, *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (finding no clearly established right to the proper implementation of adequate suicide prevention protocols in correctional facilities where no Supreme Court case had "even discusse[d] suicide screening or prevention protocols"). For this reason, the Court finds that Dr. Mack is entitled to qualified immunity.

**C.  Dr. Birdsong**

Pursuant to Rule 25(a), the Court will DISMISS Dr. Birdsong from this action. Rule 25(a)(1) provides:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties . . . . Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of statement of the fact of the death as provided for herein for the service of the motion, the action shall be dismissed as to the deceased party . . . A statement noting death must be served [on the parties as provided in Rule 5 and on nonparties as provided in Rule 4].

Fed. R. Civ. P. 25(a)(1), (3). On February 10, 2017, the ninety-day period for substitution was triggered when counsel for Dr. Birdsong suggested Dr. Birdsong's death upon the record by filing a notification of death, Dkt. No. 54, and served this notice of death upon Plaintiff in accordance with the requirements set forth in Rule 5 of the Federal Rules of Civil Procedure, *id.* at 6.

16

Although Plaintiff filed a pleading titled "motion for substitution" on February 27, 2017, this motion for substitution was deficient in that it failed to identify any successors or representatives of Dr. Birdsong. Dkt. No. 58. The Court instructed Plaintiff that Rule 25 required Plaintiff to identify and locate Dr. Birdsong's successors or representatives, and then file a motion to substitute Dr. Birdsong with the identified successor or representative. Dkt. No. 60. More than ninety days have passed since the service of the notification of Dr. Birdsong's death. Accordingly, pursuant to Rule 25(a), this action is dismissed as to Dr. Birdsong.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Dr. Mack's motion for summary judgment. Dr. Mack is terminated from this case. Pursuant to Rule 25(a), Dr. Birdsong is terminated from this action.

The Clerk shall enter judgment in favor of Defendants; terminate Docket No. 55; and close the case.

**IT IS SO ORDERED.**

Dated: 9/26/2017

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge